**GANNETT CO., INC., t/a the News Journal Company, and Jane Harriman, Defendants Below, Appellants/Cross-Appellees,**

v.

**Margo KANAGA, M.D., Plaintiff Below, Appellee/Cross-Appellant.**

No. 352, 1998.

Supreme Court of Delaware.

Submitted: Nov. 23, 1999.
Decided: May 3, 2000.

Mason E. Turner, Jr., Prickett, Jones, & Elliott, Wilmington, Delaware, for Gannett Co., Inc., t/a The News Journal Company Appellant/Cross–Appellee and Robert C. Bernius (argued), Nixon Peabody, LLP., Washington, D.C., for Jane Harriman Appellant/Cross–Appellee.

James S. Green, Seitz, Van Ogtrop & Green, P.A., Wilmington, Delaware, for Margo Kanaga, M.D. Appellee/Cross-Appellant.

Charles S. Crompton, Jr. and Philip A. Rovner, Potter Anderson & Corroon LLP, Wilmington, Delaware and Floyd Abrams and Gail Johnston, Esquire, Cahill Gordon & Reindel, New York, New York, for Amici Curiae. Of Counsel: Ralph Huber, Esquire, Sabin, Bermant & Gould, New York, New York, for Advance Publications, Inc.; Richard N. Winfield, Esquire and Margaret Blair Soyster, Rogers & Wells, New York, New York, for The Associated Press; David Kohler, Atlanta, Georgia, for Cable News Network LP, LLLP; Stuart Karle, New York, New York, for Dow Jones Company, Inc.; Carol D. Melamed, Washington, D.C., for Maryland, Delaware, District of Columbia Press Association; George Freeman, Esquire, New York New York, for The New York Times Company; Katherine Hatton, Philadelphia, Pennsylvania, for The Philadelphia Inquirer; Robin Bierstedt, New York, New York, for Time Inc.; and Mary Ann Werner, Washington, D.C., for The Washington Post.

Before VEASEY, Chief Justice, WALSH, HOLLAND, and HARTNETT, Justices and CHANDLER, Chancellor.*

WALSH, Justice for the majority:

This is an appeal from a Superior Court judgment in a libel action following a jury verdict assessing damages. The plaintiff-appellee, Margo Kanaga, M.D. ("Dr. Kanaga") claimed to have been libeled by a newspaper account of her treatment of a former patient, Pamela Kane ("Kane").

* Designated pursuant to Art. IV, § 12 of the Delaware Constitution and Supreme Court Rules 2 and 4.

The article in question was written by Jane Harriman ("Harriman") and published in a daily newspaper distributed by Harriman's employer, Gannett Co., Inc. t/a The News Journal Company ("Gannett"). Gannett and Harriman (collectively the "media defendants") defended the article as a substantially accurate report of a complaint to the New Castle County Medical Society and, thus, constitutionally protected.

The jury determined, through answers to specific interrogatories, that the article was factually false and defamatory. The jury also determined that the article caused actual damage to Dr. Kanaga, awarding her $2.6 million in compensatory damages and $250,000 in punitive damages. The jury made separate compensatory and punitive damage awards against Kane. The awards against Kane, however, have not been appealed.

In this appeal, the media defendants contend that the article in dispute was constitutionally protected fair comment and, as a matter of law, not defamation. They also challenge the award of actual damages on the ground that it was based on speculation and inadmissible expert testimony. Dr. Kanaga cross-appeals from the Superior Court's exclusion of evidence of Gannett's wealth in relation to the proof of punitive damages.

We conclude that the jury's determination of liability is sustainable factually and is consistent with the law of the case. We further conclude, however, that the jury's verdict fixing actual damages was based upon expert testimony, to which timely objection was made, that lacked an admissible foundation. Accordingly, we reverse the damages award. With respect to the cross-appeal, we hold that under the modern view on punitive damages, the wealth of the defendant is an admissible factor and reverse the Superior Court's holding to the contrary. In sum, we affirm the determination of liability but reverse the award of both actual and punitive damages and remand for a new trial limited to damages.

## I

The factual basis for this litigation is set forth at length in a previous decision of this Court that reversed a grant of summary judgment in favor of the defendants. *See Kanaga v. Gannett Co. Inc.*, Del.Supr., 687 A.2d 173 (1996) ("*Kanaga I*"). We briefly summarize those facts as they unfolded at trial.

Kane consulted Dr. Kanaga on April 2, 1992, after complaining of a heavy menstrual flow. During a physical examination, Dr. Kanaga observed a fibroid tumor "sitting in her cervix." Dr. Kanaga told Kane about the tumor and that its position would prevent her from doing a myomectomy (removal by surgical forceps). Dr. Kanaga recommended a hysterectomy for treatment of the tumor and also recommended that Kane have her ovaries and tubes removed because of a risk of ovarian cancer. Dr. Kanaga testified that she discussed with Kane her opinion that a myomectomy would be a risky procedure and not the safest or best method for treatment considering Kane's age and the position of the tumor. Dr. Kanaga, however, advised Kane to obtain a second opinion. On April 10, 1992, Dr. Kanaga's office received a request by Kane for a copy of her medical records in order to obtain a second opinion.

On April 19, 1992, Kane experienced heavy bleeding and consulted Ronaldo Domingo, M.D. ("Dr. Domingo") at the emergency room at St. Francis Hospital. Apparently, the tumor had changed position, because, upon examination, Dr. Domingo observed the tumor "coming two-thirds out of the canal." Dr. Domingo attempted to determine whether the fibroid could be easily removed by grabbing it with forceps and twisting it. After twisting it several times, the fibroid came out. Subsequently, Kane asked Dr. Domingo whether she needed a hysterectomy. Since Kane had told him previously that

another doctor had recommended a hysterectomy, Dr. Domingo was not surprised by this question, but told Kane that she did not need one "because she's no longer bleeding and the submucous fibroid is out."

On April 29, 1992, Kane called Dr. Kanaga's office to discuss scheduling a hysterectomy. Dr. Kanaga returned the call the next morning but was told Kane was unavailable and would call her that afternoon. When Kane called Dr. Kanaga, Kane secretly tape recorded the conversation.[1] During this conversation, Kane led Dr. Kanaga to believe that she had received a second opinion concerning the hysterectomy.

Kane, apparently believing that Dr. Kanaga had recommended an unnecessary surgical procedure for financial gain, contacted Harriman, a reporter for the News Journal who reported on health matters. The two met at Kane's home, and Harriman was told Kane's version of the events, including the playing of the secretly recorded telephone conversation. Approximately one week later, Kane filed a written complaint with the New Castle County Medical Society alleging that Dr. Kanaga had recommended an unnecessary surgical procedure for financial gain. Kane had earlier shared this complaint with Harriman.

Harriman proceeded to write an article detailing Kane's experience with Dr. Kanaga. Before the article was published, there was an apparent difference of opinion at the News Journal whether publication should be deferred pending the Medical Society action on Kane's complaint. Harriman testified that she recommended that "we wait until after the New Castle County Medical Society makes a decision." She was overruled, however, by her editorial supervisors.

On July 5, 1992, the newspaper article in question was published entitled "Patient feels betrayed—Says proposed hysterectomy wasn't needed." The full text is printed in *Kanaga I*, 687 A.2d at 184–85. The theme of the article is captured in its opening paragraph:

> BRANDYWINE HUNDRED—Pamela Kane feels the hysterectomy urged on her by a gynecologist she trusted would have been unnecessary, and she believes her story should be a warning to other women.

The disputed article appeared in full color on the front page of the Local Section of the July 5, 1992, *Sunday News Journal.* It was announced by a "teaser" on page 1 of the newspaper which included a photograph of Kane. Although the article noted that Dr. Kanaga had refused "to respond to a reporter's telephone calls or a reporter's letter seeking comments," it did not fully explain Dr. Kanaga's refusal, on ethical grounds, to discuss a patient's care or records in a matter pending before the Medical Society without written authorization of the patient. The article also described Dr. Domingo's reaction to Dr. Kanaga's treatment recommendation as "incredulous" even though Harriman had not verified the direct quotes attributed to Dr. Domingo.

The Medical Society ruled on Kane's complaint against Dr. Kanaga eight weeks after publication of the article. It found no basis for discipline against Dr. Kanaga, ruling, in effect, that a hysterectomy was "one of several appropriate therapies" for Kane's condition. The News Journal reported the Medical Society's ruling in an article headlined "Medical Unit Backs Doctor on Treatment."

The case was submitted to the jury in two phases through special interrogatories. In the first phase, the jury found, as to the media defendants, that: (i) the July 5 article was defamatory; (ii) the gist of

1. Kane played this recording for Harriman but thereafter destroyed it. The jury was instructed that there was evidence from which they could conclude that Kane intentionally or recklessly destroyed this taped conversation, and, if they so concluded, they could draw an unfavorable inference from that conduct.

the article was false; (iii) the statements were factual in nature; and (iv) that the article was negligently published. The jury fixed actual damages in the amount of $2.6 million. The second phase of the trial involved the presentation of evidence of punitive damages. As to the media defendants, the jury concluded that Dr. Kanaga had shown by clear and convincing evidence that both defendants had caused the July 5 article to be published with knowledge of its falsity and had acted outrageously. The jury awarded $250,000 in punitive damages against Gannett and $10,000 against Harriman.

II

The media defendants, Gannett and Harriman (hereafter "Gannett"), have asserted claims of error directed to both the liability and damages determination of the jury's findings against them. As to liability, Gannett contends that, under a journalistic standard of care, it should not be held liable for an article that was essentially true. Moreover, it argues that the disputed article was a fair comment on a matter pending before a public body and, thus, was constitutionally protected.

A.

■ At the conclusion of Dr. Kanaga's evidence at trial, Gannett moved for judgment as a matter of law on the question of whether the disputed article was fact or merely opinion. In denying the motion, the Superior Court concluded that the issue of whether the article was fact or opinion posed a jury question. We agree. Taken as a whole, the article conveys the impression that Dr. Kanaga recommended unnecessary surgery for financial gain. The reporting of Kane's complaint to the Medical Society was prefaced by a headline depicting the patient as feeling betrayed by her physician—an obvious violation of the duty owed by a physician to a patient. The use of the term "incredulously" to describe Dr. Domingo's view of Kane's treatment by Dr. Kanaga also lacked a factual basis. In providing a characterization of Dr. Kanaga's conduct by a fellow physician that questioned Dr. Kanaga's medical ethics, the article, on its face, impinged upon her professional image.

Apart from the unfavorable depiction of Kane's treatment by Dr. Kanaga, the jury could conclude that the timing of the publication of the article evidenced journalistic irresponsibility. As the trial judge noted in denying Gannett's post-trial motion for judgment or a new trial:

> Ms. Harriman and her superiors at Gannett were aware prior to July 5th that a ruling would be made by the Medical Society in the near future yet they decided to present a highly charged, biased, one-sided version of events. This story did not involve a plane crash or other immediate news event. In addition, the medical records attached to Kane's complaint and which Ms. Harriman had prior to presenting the article differed in several key respects from Kane's complaint. In short, the media defendants had information available from these records to further alert them to the dangers of proceeding full speed ahead through Kane's torpedoes. One treatise from England, for instance, which Ms. Harriman used was even unknown to the media defendant's medical expert.

*Kanaga v. Gannett Co., Inc.*, Del.Super., C.A. No. 92C-12-182-JOH, 1998 WL 729585, at *6 (July 10, 1998).

■ Relying upon the *Restatement (Second) of Torts*, § 580B, cmt. g (1977), Gannett appears to suggest that juries should not be permitted to draw "lay inferences" to determine false or defamatory communications. It is not clear from the record that Gannett presented this argument below, but, in any event, we find it unavailing. Under D.R.E. 702, expert testimony is admissible if scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence

or to determine a fact in issue. Whether expert testimony is required to pose a factual issue is a different question. There is some decisional support for the claim that expert testimony is required to prove negligence of a media defendant in a libel action. *See e.g. Seegmiller v. KSL, Inc.,* Utah Supr., 626 P.2d 968, 976 (1981). The majority, and better reasoned view, appears to the contrary. *See Kohn v. West Hawaii Today, Inc.,* 65 Haw. 584, 656 P.2d 79, 83 (1982); *Schrottman v. Barnicle,* 386 Mass. 627, 437 N.E.2d 205, 215 (1982); *Greenberg v. CBS, Inc.,* 69 A.D.2d 693, 419 N.Y.S.2d 988, 998 (1979).

Gannett has not suggested what specialized knowledge was necessary to assist the jury. Although Harriman had many years of experience as a reporter, she had no special training to become one. The issue of whether the media defendants deviated from a journalistic standard of care was well within the grasp of a jury and no expert testimony was necessary.

Gannett concedes that the trial judge properly instructed the jury that Dr. Kanaga was required to prove that Gannett had "deviated from that degree of care, caution or attention that a reasonable reporter and newspaper would use under similar circumstances." In *Kanaga I,* 687 A.2d at 182, this Court set forth certain factual issues that the record, as now constituted, properly posed for the jury concerning both the content and timing of the article. The evidence presented at trial fully supported the viability of those issues for jury consideration. In rejecting Gannett's explanation that Harriman followed accepted newspaper reporting techniques in investigating the facts and crafting the article, the jury viewed Gannett's conduct as fully below acceptable standards to the point of irresponsibility.

B.

Gannett, supported by the *amici,*[2] further argues that the conduct of the media defendants is constitutionally protected by the fair reporting privilege. This claim was asserted before and after trial in the Superior Court, and we review it under a *de novo* standard. We note, however, that this claim was considered at length in *Kanaga I,* 687 A.2d 173, and is largely controlled by the law of the case. *See Kenton v. Kenton,* Del.Supr., 571 A.2d 778, 784 (1990) ("The 'law of the case' is established when a specific legal principle is applied to an issue presented by facts which remain constant throughout the subsequent course of the same litigation.")

The Chancellor's dissent revisits issues already decided by this Court in *Kanaga I.* In that Opinion, these issues were subsumed in the calculus of this Court's careful and thorough consideration of the libel and First Amendment jurisprudence. We believe those issues were correctly decided in *Kanaga I.* Accordingly, it serves no useful purpose to reconsider them on this appeal. The law of the case doctrine requires that there must be some closure to matters already decided in a given case by the highest court of a particular jurisdiction, particularly when (with a different composition of jurists) that same court is considering matters in a later phase of the same litigation.

The Chancellor correctly notes that the law of the case doctrine is not inflexible in that, unlike *res judicata,* it is not an *absolute* bar to reconsideration of a prior decision that is clearly wrong, produces an injustice or should be revisited because of changed circumstances. *See Brittingham v. State,* Del.Supr., 705 A.2d 577, 579 (1998); *Zirn v. VLI Corp.,* Del. Supr., 681 A.2d 1050, 1062 n. 7 (1996). The law of the case doctrine, like the *stare decisis* doctrine, is founded on the principle of stability and respect for court processes and precedent. The *stare decisis*

2. The *amici* in this case are Advance Publications, Inc., The Associated Press, Dow Jones Company, Inc., Maryland, Delaware, District of Columbia Press Association, The New York Times Company, The Philadelphia Inquirer, Time Inc. and The Washington Post.

discussion of the majority of the United States Supreme Court in the case of *Planned Parenthood of Southeastern Pa. v. Casey,* 505 U.S. 833, 866, 112 S.Ct. 2791, 120 L.Ed.2d 674 (1992), is applicable by analogy to the law of the case principles that should guide us in this case:

> [F]requent overruling would overtax the country's belief in the Court's good faith.... [Excessive] disturbance of prior rulings would be taken as evidence that justifiable reexamination of principle had given way to drives for particular results in the short term. The legitimacy of the Court would fade with the frequency of its vacillation.

Exceptions to the law of the case doctrine for clearly erroneous decisions, unjust results or significantly changed circumstances are not applicable here. *Cf. Weedon v. State,* Del.Supr., 750 A.2d 521 (2000) (recantation of factual basis for hearsay exception may provide basis for different ruling notwithstanding the law of the case doctrine). Our decision in *Kanaga I* is sound law and properly takes its place in the solid jurisprudence of this Court. When viewed through the retrospective lens of the trial in this case that followed that decision, it is clear that the defamation issues were properly submitted to the jury and should not have been decided on summary judgment. The verdict here on the issue of liability (as distinct from damages) was supported by ample evidence.

The basic thrust of Gannett's fair reporting defense is that the disputed article "accurately reported Kane's allegations" in a matter of public concern pending before a tribunal whose proceedings are "authorized by law." The *amici* argue that the First Amendment provides a constitutional privilege to report on charges of misconduct made to official or *quasi*-official disciplinary bodies and that this case bears similarity to the decision of the United States Supreme Court in *Landmark Communications Inc. v. Virginia,* 435 U.S. 829, 98 S.Ct. 1535, 56 L.Ed.2d 1 (1978). In *Landmark,* the Court reversed the criminal conviction of a newspaper publisher who reported on the pending inquiry of a judicial disciplinary committee into the alleged misconduct of a judge. The Court ruled that the need for confidentiality in commission proceedings did not justify the infringement of First Amendment guarantees through criminal sanctions. The *amici* contend that the description of a complaint to the Medical Society relating to the competence of a physician is, at least, as much of public concern as the conduct of a judge.

█ While certain language in *Landmark* is supportive of the principle of free expression by the media, that holding must be viewed in the context of the underlying criminal prosecution which prompted review. *Landmark* did not involve a private action for defamation but, rather, a direct state action to punish for truthful and accurate publication of a government proceeding. Accordingly, the Court's concern that governmental action through criminal sanctions may prove a form of censorship is not implicated here. Further, Dr. Kanaga was not a public official nor had she thrust herself into the public gaze. Her actions that were the subject of media scrutiny occurred entirely within the private treatment of a patient. Any review of that treatment by a regulatory body was, itself, subject to an aura of confidentiality for the benefit of both the physician and the patient. *See Johnson Newspaper Corp. v. Melino,* 77 N.Y.2d 1, 563 N.Y.S.2d 380, 564 N.E.2d 1046, 1050–51 (1990). Thus, she was protected from public or private defamation.

█ As this Court noted in *Kanaga I,* in reversing the grant of summary judgment on the fair reporting claims, "since the statements published by the News Journal do not constitute the fair and accurate reporting of a judicial proceeding or the governmental acts of executive officials of government, the fair reporting privilege does not protect these statements against

actions for libel." 687 A.2d at 182. The media defendants were permitted to raise the privilege as a defense, with the reasonableness of the claim left to the jury. *See id.* Even when the privilege is properly asserted, however, its protection extends to opinion, not express or implied misstatements of fact. Here, the jury specifically found that statements in the article were factual in nature and their substance was false. Even if the privilege of fair reporting is viewed as one of constitutional stature, the article's falsity takes it out of the realm of such protection.

We conclude that the claim of defamation was correctly submitted to the jury under appropriate instructions by the Superior Court. We further conclude that the jury's determination of liability is supported by the evidence and, therefore, we affirm. *See Medical Center of Del. v. Lougheed,* Del.Supr., 661 A.2d 1055, 1061 (1995).

III

We next address Gannett's attack on the award of damages. The media defendants contend that Dr. Kanaga failed to present legally cognizable evidence of reputation injury and that her claim for lost profits was speculative and based on inadmissible evidence.

A.

The parties are in sharp disagreement concerning the standard of review that this Court should apply to Gannett's damages claims. Gannett contends that in view of the underlying constitutional privilege at issue, any award of damages should be subject to heightened appellate scrutiny. *See NAACP v. Claiborne Hardware Co.,* 458 U.S. 886, 918, 102 S.Ct. 3409, 73 L.Ed.2d 1215 (1982). ("While the State legitimately may impose damages for the consequences of violent conduct, it may not award compensation for the consequences of nonviolent, protected activity. Only those losses proximately caused by unlawful conduct may be recovered."). Dr. Kanaga maintains that the jury's factual determinations are conclusive if supported by the evidence and, to the extent the damages awarded were affected by the admissibility of evidence, the trial court's evidentiary rulings must be reviewed under an abuse of discretion standard. *See Laws v. Webb,* Del.Supr., 658 A.2d 1000, 1008 (1995).

We need not decide whether review of the damages award arising out of constitutionally protected activity may implicate more exacting standards than those posed in other tort actions. Nevertheless, to recover in this case, Dr. Kanaga had to demonstrate "actual injury," absent a showing of knowledge of falsity or reckless disregard for the truth. *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 348–49, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974). Without defining actual injury, the United States Supreme Court has stated that injury is not limited to out-of-pocket loss and would include impairment of reputation and standing in the community, personal humiliation and mental anguish and suffering. *See id.* at 350, 94 S.Ct. 2997. *Gertz* has subsequently been held to be applicable when a matter of public concern was involved. *See Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.,* 472 U.S. 749, 760–61, 105 S.Ct. 2939, 86 L.Ed.2d 593 (1985).

To a significant degree, the scrutiny imposed on our review of the damages awarded in this case has been limited by the jury's factual finding of falsity in the liability phase of the trial. Moreover, the jury's award of punitive damages was based on a determination that the media defendants acted with reckless disregard for the truth of the statements contained in the disputed article. In view of the jury's factual findings, we will review the Superior Court rulings on evidence directed to the damages claim pursuant to an abuse of discretion standard.

B.

The Superior Court instructed the jury that Dr. Kanaga must prove actual damages. Under that court's instructions, the jury award for actual damages had two components: (i) humiliation and loss of reputation and (ii) past and future lost income attributable to impairment of professional standing.[3] Although Gannett does not dispute the correctness of the court's instruction, it contends that Dr. Kanaga produced no evidence of reputation injury through testimony of patients or other physicians. Gannett fails, however, to credit Dr. Kanaga's own testimony that she suffered "daily humiliation and embarrassment." Dr. Kanaga also testified that while she did not directly hear conversations in "supermarkets, beauty parlors and elsewhere," she was told about them. We further find the scope of the defamation to be clearly established by its intended circulation to 140,000 readers.

In *Spence v. Funk*, Del.Supr., 396 A.2d 967, 970 (1978) (citing *Prosser Law of Torts* § 112 (1971)), this Court held that there is a presumption of damages with respect to statements that "malign one in a trade, business or profession." Thus, under Delaware law, injury to reputation is permitted without proof of special damages. In *Kanaga I*, this Court ruled that "[t]o accuse Dr. Kanaga of recommending unnecessary surgery for her own pecuniary gain is to malign her in her business or profession." 687 A.2d at 181. *Spence's* presumption would sustain a separate humiliation award in this case had one been rendered. The jury's 2.6 million dollar "actual damages" award, however, did not separate humiliation damages from economic damages. On this record, proof of the latter category is problematic.

C.

Four witnesses testified on Dr. Kanaga's behalf on the issue of compensatory damages. Three of these witnesses were fact witnesses: Dr. Kanaga, Dr. Anna Marie D'Amico ("Dr. D'Amico"), and Dr. Kanaga's accountant, Anthony D'Amato ("D'Amato"). John Stapleford, Ph.D., ("Stapleford"), an economist, gave expert testimony concerning damages for past and future lost income.

Dr. Kanaga testified that she opened her solo practice in 1978 and that by 1991 her "new patient" waiting list was "roughly three months." In 1998, however, her appointment list had "plenty of openings." As a specialist she relied, in great part, on referrals from other physicians and patients. Dr. Kanaga also testified that following publication of the article, two people filed complaints against her with the

3. The Superior Court's damage instruction included the following:

If you find in favor of Doctor Kanaga and, in so doing, have determined that she has proven by a preponderance of the evidence that she incurred actual damage caused by the publication of the article by Ms. Harriman and The News Journal, you should award as her damages an amount which will reasonably compensate her for her damages. In determining such damages, you shall consider the following.

Any impairment of Doctor Kanaga's reputation, any personal humiliation and any mental anguish and suffering incurred by her as a result of the defendants' statements.

Insofar as they have been proved by a preponderance of the evidence and insofar as they were caused by the defendants' article, past and future loss of income incurred by Doctor Kanaga. As to future lost income, if any, your award must be the future lost income reduced to present value.

In determining how much Doctor Kanaga's reputation has been harmed you must consider the reputation that she enjoyed before the defamatory publication as compared to the reputation that she enjoyed after the publication and whether that reputation has actually been diminished since the publication. You also may—you may also consider the manner in which the defamatory matter was distributed and the extent of its circulation in Doctor Kanaga's community and whether those who read the article understood it to refer to her. In the absence of contrary evidence, the law presumes that Doctor Kanaga, at the time any defamatory statements were made, enjoyed a good name and reputation.

Medical Society, and others called to say, "I'm not coming to you because of the article." In 1991, the last full year before the defamatory article, her gross income was $769,038 with a net income of $441,-149. In 1993, the first full year after the article, her gross had dropped to $556,151 and her net to $292,028.

Dr. D'Amico, also a Wilmington obstetrician/gynecologist, testified that she had known Dr. Kanaga since early 1970 and considered her a "fine practicing physician." Dr. D'Amico was shocked and outraged when she read the News Journal article. She further testified that, at present, "women [OB/GYNS] are busier than ever" and that she has not seen a falling off of income in her own practice.

The only other fact witness on damages was D'Amato. D'Amato was proffered as a witness who, together with Dr. Kanaga, "will be providing causation testimony." During trial, the defendants objected to D'Amato's proposed testimony on the ground that it would be opinion based. A *voir dire* was permitted, during which D'Amato was asked, "[h]as Doctor Kanaga told you that the news article she's suing about caused her income to drop?" D'Amato responded, "[y]es. She's mentioned that and I agree." He was then asked the basis for that opinion, to which he responded that he had many physician clients and that "her practice is the only one that has seen any severe drop-off of income over the past four or five years." Also during *voir dire,* D'Amato, in response to a question whether he was offering comparison opinion, stated that Dr. Kanaga's income started above the others and "now she's below." Thereafter, defense counsel objected to D'Amato's testimony based on his not being identified as an expert, irrelevancy and hearsay.

The Superior Court ruled that D'Amato would not be permitted to testify that a decline in Kanaga's income must be due to the newspaper article, stating that "[i]n connection with comparison to other practices, it depends upon how far that question goes to be honest with you. I think that goes more to weight than to admissibility." The court further held that D'Amato did not have to reveal the names of the other practices he considered. The defendants were provided no underlying documentation for the other practices as they had requested.

D'Amato testified that he prepared the income tax return for Dr. Kanaga and her husband from data supplied by Dr. Kanaga. The work included the preparation of Schedule Cs.[4] The Schedule Cs, which formed the basis for past and future income losses, were offered for identification at the end of D'Amato's testimony but were not thereafter offered into evidence or specifically referred to by D'Amato. D'Amato gave no testimony regarding specific dollar amounts for Dr. Kanaga's yearly income but spoke simply in terms of a "trend" in comparison with the income of other unidentified physicians. In overruling an objection to D'Amato's comparison testimony as hearsay, the trial judge ruled:

> First of all, the question does not elicit a hearsay answer. There's no specific dollar figure. It is a question, a fact whether it goes up or down. That's not an opinion. Whether something is higher than lower in terms of dollars and something else is not an opinion. That's a fact. *The amount, the difference, is not in evidence, and will not be in evidence, and I wouldn't allow it to be in evidence, because your hearsay objection might be appropriate.* But short of that, I will overrule the objection and I will note that it's made. (emphasis added).

4. Schedule C is the income/expense portion of the Individual Income Tax Return (Form 1040) required by the Internal Revenue Service for reporting profit or loss from a business. The Schedule Cs reviewed by D'Amato were unusual in that they reflected not only Dr. Kanaga's medical practice but her husband's law practice which he conducted from the same location.

Thus, D'Amato was not permitted to testify as to a dollar difference between Dr. Kanaga's practice and those of other physician clients.

Despite this restriction, however, the earnings difference became a critical factor in the projection of lost income, past and future, when that matter became the subject of expert testimony. Gannett contends that the prejudicial effect of the admission of D'Amato's comparison evidence, for which he provided neither specific dollar amounts nor causation, was compounded when Stapleford used that evidence and the Schedule Cs that were not offered into evidence, as the premise for his projection of lost profits.

We agree that Stapleford's expert testimony lacked the required factual basis for projecting Dr. Kanaga's claimed lost earnings. Stapleford was retained before trial to analyze the gross and net income from Dr. Kanaga's practice from 1993 to 1997. He noted that she experienced a significant decrease in income in 1992 and 1993 and assumed that the reduction was attributable to the disputed article and to no other cause. Using net income figures provided by Dr. Kanaga's husband,[5] Stapleford prepared a chart comparing Dr. Kanaga's net income with the "Average OB/GYN" practitioners on a national level. This chart, later introduced into evidence, is attached as an Exhibit to this opinion. Stapleford observed that "Dr. Kanaga's earnings went up, net and gross, at a rate that was almost double the rate of the average OB/GYN in the country over the time period 1982 through 1991 ... net earnings, 64 percent above and gross earnings, 37 percent above." Extrapolating from that data, Stapleford calculated the total income loss from 1992 to assumed retirement ages of 60, 62 and 65. Future losses were discounted to present value at the rate of six percent. In making his calculations of past and future earnings losses, Stapleford assumed that the newspaper article was the "cause of the decline" and that the past rate of decline would not dissipate through the remaining years of Dr. Kanaga's work life. In short, his projections of future wage loss assumed that Dr. Kanaga's earnings pattern would never recover from the effect of the libel.[6]

Defendants twice filed motions *in limine* with respect to Stapleford's proposed testimony. Both motions were denied. Just prior to his testimony, the defendants renewed their objection to Stapleford's use of assumptions that were unsupported by the evidence. They also objected on the basis of hearsay to the use of dollar figures that were not in evidence. These objections were asserted post-trial in motions for a new trial and preserved for appeal. The Superior Court consistently ruled that the information upon which Stapleford relied was "the kind of information [upon] which experts in this field do rely" under D.R.E. 703 and permitted the testimony exemplified by the earnings chart.

On appeal, Gannett renews those objections directed to Stapleford's trial testimony. It argues that the jury's undifferented damages for income loss attributable to the libel was based on a "before/after" calculation of income premised on unoffered and unadmitted income data. Dr. Kanaga, while conceding that the Schedule Cs were never actually admitted into evidence, claims they were nevertheless clearly admissible and would have been

5. Stapleford also examined Dr. Kanaga's Schedule Cs for the same years, but had already made his projections based on comparable data supplied by Dr. Kanaga's husband.

6. When cross-examined about the basis for projecting the income differential into the future, Stapleford testified:

Q. You were simply told to assume that the effects of the article would continue unabated forever?
A. Yes.
Q. And that Miss Harriman's words would be resonating into eternity?
A. Well, not eternity. Work life expectancy. But I did ask if the effects of the article are diminishing, and I asked Mr. Kanaga, and he said no.

admitted if offered. She also asserts that the defendants were not prejudiced by this technical deficiency because they had ample opportunity, both during discovery and at trial, to review, cross-examine and rebut the earnings data relied upon by Stapleford.

The admissibility of the underlying data relied upon by Stapleford turns on an interpretation of D.R.E. 703. Under that Rule:

> [t]he facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to him at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence.

To what extent an expert witness may rely on material facts not directly in evidence but assumed is an issue unresolved under D.R.E. 703. Further, there is a split of authority in the interpretation of Federal Rule of Evidence 703, which is identical to D.R.E 703. A majority of courts facing the issue take the position that while the "inadmissible data" relied upon by the experts in forming their opinion is admissible to explain their reasoning, that information is not admissible as substantive evidence to prove the truth of the matters therein. *See, e.g., United States v. 0.59 Acres of Land,* 9th Cir., 109 F.3d 1493, 1496–97 (1997); *State v. Recor,* 150 Vt. 40, 549 A.2d 1382, 1388 (1988) (interpreting an identical Vermont Rule of Evidence). *Rose Hall, Ltd. v. Chase Manhattan Overseas Banking Corp.,* D.Del., 576 F.Supp. 107, 158 (1983); *but see In re Art Shirt Ltd., Inc.,* E.D. Pa., 93 B.R. 333, 340 (1988) (permitting testimony of expert to serve as substantive evidence of insolvency notwithstanding underlying report not being admitted into evidence.)

While an expert is afforded latitude under Rule 703 to incorporate into the methodology source material normally relied upon in the expert's field, the use of specific contested data poses a particular risk of circumvention of hearsay restrictions. As one commentator notes:

> Although the Federal Rules of Evidence provide many exceptions to Rule 802's general prohibition of hearsay, Rule 703 is not such an exception. The danger exists, however, that Rule 703 can be used as a "back door" hearsay exception—a crafty litigant could give hearsay to its expert for the purpose of having the expert refer to it as a basis for the expert's opinion. The jury may well disregard any instruction that it consider the hearsay only for evaluating the expert's basis and not as substantive evidence.

David J. Capra, *The Daubert Puzzle,* 33 Ga. L.Rev. 699, 775 (1998).[7]

We recognize that Rule 703's "reasonably relied upon by experts in the particular field" language is broad and arguably ambiguous. But, at a minimum, where a timely objection is made on hearsay grounds, the trial judge must determine the admissibility of the underlying data. A reliability analysis under Rule 703 is not a substitute for a hearsay ruling or a balancing exercise under Rule 403.[8] *See In Re Paoli R.R. Litig.,* 3d Cir., 35 F.3d 717, 747–750 (1994). Indeed, it is present-

7. In *M.G. Bancorporation, Inc. v. LeBeau,* Del. Supr., 737 A.2d 513, 521–22 (1999), this Court applied the United States Supreme Court's interpretation of F.R.E. 702 as set forth in *Daubert v. Merrell Dow Pharm., Inc.,* 509 U.S. 579, 589–90, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), to D.R.E. 702.

8. **Rule 403. Exclusion of relevant evidence on grounds of prejudice, confusion or waste of time.**

> Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues or misleading the jury, or by considerations of undue delay, waste of time or needless presentation of cumulative evidence.

ly proposed that a balancing requirement be incorporated into Rule 703 to insure against "back-door" hearsay.[9]

It is no answer that the disclosure of the contested data during discovery eliminated the risk of surprise at trial. Here, the defendants filed numerous objections to the use of the underlying data and the trial court was not free to admit such data simply by a literal application of Rule 703. Nor was Stapleford's use of unadmitted earnings data a mere technical deficiency. Dr. Kanaga relied upon two witnesses to provide a pattern of earnings against which to measure the effect of the libel from the time of its publication in 1992 to the end of her life work expectancy. D'Amato's testimony, proffered originally as causation evidence, consisted essentially of a discussion of Dr. Kanaga's earning trends in comparison with other unidentified medical practitioners. D'Amato's mere identification of the Schedule Cs did not render them substantive evidence either for his use or, later, by Stapleford.[10] In sum, D'Amato was not permitted to testify as to the specifics of Dr. Kanaga's earning history and Stapleford disclaimed any direct knowledge of it. The result was that the earnings data came into evidence without the benefit of cross-examination of any fact witness as to its accuracy. The earnings data formed the premise for Stapleford's income loss projections. Moreover, the projection of future loss income was, in itself, highly speculative since it assumed that Dr. Kanaga's practice would never recover from the effect of the libel so long as she continued to practice her speciality.

Once liability is established, a plaintiff seeking recovery of damages in a tort action must establish causation and consequential damage. While the plaintiff is entitled to the benefit of reasonable inferences from established facts, the jury cannot supply any omission by speculation or conjecture. *See Henne v. Balick*, Del. Supr., 146 A.2d 394, 396 (1958). The nature and extent of future consequences must be established with "reasonable probability" or "there can be no recovery for that item of damages." *Drozdov v. Webster*, Del.Supr., 345 A.2d 895, 896 (1975).

Given the magnitude of the jury's award in this case, it is obvious that it accepted the opinion of the only witness who assigned a dollar amount to Dr. Kanaga's claim for lost earnings. The record demonstrates that Dr. Kanaga suffered some drop in earnings following the publication of the article, but the jury rendered the compensatory damages in one lump sum, presumably representing damages for humiliation and loss of professional income. We are, thus, unable to segment that portion of the award attributed to Dr. Kanaga's past and future earnings. Because the evidence directed to that portion of the award failed to establish her actual injury with reasonable probability under required standards for admissibility, the damages award must be reversed.

Due to the fact that our reversal of the damages portion of the jury verdict in this case may occasion a retrial as to that portion of the damages award assessed against Gannett, we offer the following additional observations. D.R.E. 705 pro-

9. The Federal Advisory Committee on Evidence and the Standing Committee on Rules of Practice and Procedure of the U.S. Judicial Conference has proposed the addition of the following language to Rule 703:

> Facts or data that are otherwise inadmissible shall not be disclosed to the jury by the proponent of the opinion or inference unless the court determines that the probative value in assisting the jury to evaluate the expert's opinion substantially outweighs their prejudicial effect.

Report of Committee

10. Kanaga's counsel at oral argument suggested that marking documentary exhibits for identification but never offering them is the usual practice in the Superior Court. If such a practice exists, it is fraught with difficulty, as this case attests, particularly if a party seeks to rely upon the substantive value of that evidence as record support for a contested element of proof.

vides a procedural framework for identifying and dealing with disputes over an expert's use of inadmissible factual information.[11] Under D.R.E. 705, if there is an objection to the proposed opinion testimony of an expert witness, the expert must disclose the facts and data upon which he or she relies. If the offering party, with the court's approval, agrees to introduce the necessary data later but fails to do so, the objector may move to strike the expert's opinion just as it would have moved to strike the answer to a hypothetical question if the assumed facts were never introduced. Although a *voir dire* of Stapleford occurred here, the trial court admitted the underlying data without focusing on its hearsay nature and, thus, there was no legal basis for a motion to strike at the conclusion of the expert's testimony.

We recognize that the trial judge was acting against the background of what had occurred during discovery in the course of which he made several rulings. The trial judge apparently believed that it was sufficient that the defendants could have cross-examined Stapleford regarding the accuracy of the earnings data during deposition and at trial. But discovery practices are not a substitute for the proper admission of evidence at trial where the rules of evidence apply with greater force. The participation of a jury requires rigorous adherence to standards designed to prevent the receipt of inadmissible evidence.

Finally, we note that expert testimony improperly admitted is not cured through jury instructions that authorize the disregarding of expert opinions if the jury rejects the factual basis. Inadmissible facts that form the basis for an expert's opinion are not simply elements of proof subject to the jury's "weighing" option.

## IV

The reversal of the compensatory damages award requires that we consider Dr. Kanaga's cross-appeal from the Superior Court's refusal to permit evidence of Gannett's financial condition in connection with the punitive damages award. There must be a retrial on punitive damages, in any event, however, because of the requirement of proportionality between compensatory damages accompanied by an award of punitive damages. *See Jardel Co., Inc. v. Hughes*, Del.Supr., 523 A.2d 518, 528 n. 6 (1987).

[25] In a pretrial ruling, the Superior Court held that Gannett did not have to produce evidence of its financial condition, because the financial condition of a defendant was irrelevant to an award of punitive damages in actions for defamation. The court relied upon two Superior Court decisions which, while "old," were considered deserving of adherence in the absence of a definitive ruling by this Court. *See Naylor v. Ponder*, Del.Super., 41 A. 88, 89 (1895) (the jury "may take into consideration the position, rank, and influence of the defendant in the community. But ... not ... his pecuniary condition."); *MacDonough v. A.S. Beck Shoe Corp.*, Del.Super., 15 A.2d 436, 438 (1940) (following the holding in *Naylor* but noting that the great weight of authority is in support of

11. D.R.E. 705, which is more exacting in its disclosure requirements than its counterpart under the Federal Rules of Evidence, provides:

Rule 705. Disclosure of facts or data underlying expert opinion.

(a) *Disclosure of facts or data underlying expert opinion.* The expert may testify in terms of opinion or inference, provided he first identifies the facts and data upon which he bases his opinion and his reasons for the opinion, unless the court requires otherwise. The expert may in any event be required to disclose the underlying facts or data on cross-examination.

(b) *Objection.* An adverse party may object to the testimony of an expert on the ground that he does not have a sufficient basis for expressing an opinion. He may, before the witness gives his opinion, be allowed to conduct a voir dire examination directed to the underlying facts or data on which the opinion is based.

the rule "that the pecuniary circumstances of the defendant in an action for defamation are admissible..."). 

In the context of a medical malpractice action, this Court has held that "[e]vidence of the defendant's wealth is admissible to enable the jury to assess a penalty which will appropriately punish and deter." *Strauss v. Biggs,* Del.Supr., 525 A.2d 992, 1000 (1987). Further in *Jardel v. Hughes,* we noted that "the defendant's financial well being" is one of the factors to be considered by the jury in assessing punitive damages. 523 A.2d at 528 n. 6. The "vast majority of courts which have considered the issue of whether the trier of fact may ... consider the wealth of the defendant in fashioning a punitive award have determined that the defendant's wealth is an appropriate consideration because the degree of punishment or deterrence is to some extent proportionate to the means of the wrongdoer." Annotation, *Punitive Damages: Relationship to Defendant's Wealth as Factor in Determining Propriety of Award,* 87 A.L.R.4th 141, 151 (1991).

In our view, there is no logical basis for distinguishing between punitive damages in defamation cases and other tort causes of action. The relevancy of a defendant's wealth is the same. Any concern that the imposition of punitive damages may be excessively applied against a wealthy defendant is alleviated by the trial court's duty to insure that such damages have the required factual showing of recklessness and that any award of punitive damages be proportionate to the award of compensatory damages. *See Jardel,* 523 A.2d at 528–31.

## V

Upon a complete review of the record, we conclude that the jury's determination of liability for defamation is fully supported by the evidence and the law of the case. Accordingly, the liability portion of the judgment is AFFIRMED. The award of actual damages, however, is not supported by admissible evidence and must be REVERSED. The punitive damages award is also REVERSED because of the exclusion of evidence regarding the defendants' wealth. The matter is REMANDED for a new trial limited to compensatory and punitive damages as to the media defendants.

## EXHIBIT

NET INCOME

| Year | Dr. Kanaga Actual | Estimated | Average OB/GYN * | Difference | Kanaga As a % of the Average | Estimated Loss |
|---|---|---|---|---|---|---|
| 1982 | $126,436 | | $112,300 | $14,136 | 112.6% | |
| 1983 | | | $118,100 | | | |
| 1984 | $221,584 | | $118,800 | $102,784 | 186.5% | |
| 1985 | $229,398 | | $124,300 | $105,098 | 184.6% | |
| 1986 | $227,602 | | $135,900 | $91,702 | 167.5% | |
| 1987 | $134,096 | | $163,200 | ($29,104) | 82.2% | |
| 1988 | $234,608 | | $180,700 | $53,908 | 129.8% | |
| 1989 | $406,794 | | $194,300 | $212,494 | 209.4% | |
| 1990 | $535,164 | | $207,300 | $327,864 | 258.2% | |
| 1991 | $441,149 | | $221,800 | $219,349 | 198.9% | |
| 1992 | $325,286 | $375,080 | $220,700 | $104,586 | 147.4% | $49,794 |
| 1993 | $296,028 | $377,120 | $221,900 | $74,128 | 133.4% | $81,092 |
| 1994 | $290,258 | $340,581 | $200,400 | $89,858 | 144.8% | $50,323 |
| 1995 | $242,249 | $415,189 | $244,300 | ($2,051) | 99.2% | $172,940 |
| 1996 | $263,070 | $427,644 | $251,629 | | | $164,574 |
| 1997 | $270,699 | $440,046 | $258,926 | | | $169,347 |
| NET LOST PAST NET INCOME | | | | | | $688,070 |

EXHIBIT

| Year | Dr. Kanaga Actual | Estimated | Average OB/GYN * | Difference | Kanaga As a % of the Average | Estimated Loss | Discounted To PV |
|---|---|---|---|---|---|---|---|
| 1998 | $278,549 | $452,807 | $266,435 | | | $174,258 | $164,394 |
| 1999 | $286,627 | $465,939 | $274,162 | | | $179,312 | $159,587 |
| 2000 | $294,939 | $479,451 | $282,112 | | | $184,512 | $154,920 |
| 2001 | $303,493 | $493,355 | $290,294 | | | $189,862 | $150,389 |
| 2002 | $312,294 | $507,662 | $298,712 | | | $195,368 | $145,991 |
| 2003 | $321,350 | $522,385 | $307,375 | | | $201,034 | $141,721 |
| 2004 | $330,670 | $537,534 | $316,289 | | | $206,864 | $137,576 |
| 2005 | $340,259 | $553,122 | $325,461 | | | $212,863 | $133,553 |
| 2006 | $350,127 | $569,163 | $334,899 | | | $219,036 | $129,647 |
| 2007 | $360,280 | $585,669 | $344,612 | | | $225,388 | $125,856 |
| 2008 | $370,728 | $602,653 | $354,605 | | | $231,925 | $122,175 |
| 2009 | $381,479 | $620,130 | $364,889 | | | $238,650 | $118,602 |
| 2010 | $392,542 | $638,114 | $375,471 | | | $245,571 | $115,133 |
| 2011 | $403,926 | $656,619 | $386,359 | | | $252,693 | $111,766 |
| 2012 | $415,640 | $675,661 | $397,564 | | | $260,021 | $108,498 |
| 2013 | $427,694 | $695,255 | $409,093 | | | $267,561 | $105,325 |
| 2014 | $440,097 | $715,417 | $420,957 | | | $275,321 | $102,244 |
| 2015 | $452,859 | $736,165 | $433,164 | | | $283,305 | $99,254 |
| PV TOTAL LOST FUTURE NET INCOME | | | | | | | |
| Retirement Age 60.4 | | | | | | $2,594,137 | $1,747,734 |
| Retirement Age 62 | | | | | | $2,996,340 | $1,927,585 |
| Retirement Age 65 | | | | | | $3,802,736 | $2,242,265 |

* *Socioeconomic Characteristics of Medical Practice,* Center for Health Policy Research, selected years

CHANDLER, Chancellor, dissenting.

A defendant in this case, Pamela Kane, was a patient of the plaintiff, Dr. Margo Kanaga. Dr. Kanaga located a small benign tumor in Kane and strongly recommended a hysterectomy, a surgical procedure requiring a hospital admission, to remove it. Dr. Kanaga's office demanded a $500 advance payment before performing the procedure.

Before the hysterectomy was scheduled, Kane had an episode of heavy uterine bleeding and went to a hospital emergency room. The emergency room doctor, Dr. Domingo, removed the tumor by simply grasping it with a forceps and twisting it out—without performing a hysterectomy or other invasive surgical operation, without a hospital stay, without removing any reproductive organs and without requiring a fee to be paid in advance. These facts are undisputed.

Kane formed the opinion that she had received poor treatment from Dr. Kanaga and believed that the treatment was based on what she saw as the doctor's greed rather than Kanaga's informed medical opinion. Kane filed a complaint with the New Castle County Medical Society (the "Medical Society"). A newspaper owned by defendant Gannett Corporation, *The News Journal,* published an article about Kane's experience with Dr. Kanaga, stating in detail the true facts, which I have recited here. The article also reported the opinion Kane had formed based upon those facts—that she had received poor treatment from Dr. Kanaga. It is Kane's right under the First Amendment to tell her story and to state the opinions that she has formed based on her experience. It is *The News Journal's* First Amendment right to print a story reporting accurately the facts of Kane's case and Kane's opinions based on the stated facts.

Given these circumstances, the Superior Court in 1995 properly granted summary judgment in favor of defendants in this case.[12] Unfortunately, this Court reversed that judgment, allowing this libel action to go to a jury based upon *The News Journal*

12. *Kanaga v. Gannett Co., Inc.,* Del.Super., 1995 WL 716938, Herlihy, J. (Oct. 20, 1995 ("Trial Court Op.")).

article I have described.[13] That jury trial resulted in a verdict for Dr. Kanaga and against the defendants of more than $3 million.[14] This enormous verdict (indeed, any verdict) against a newspaper or an individual for exercising fundamental freedoms of speech and press is unprecedented. If an individual can be held liable for stating her opinion about medical treatment she has received, without misstating, explicitly or impliedly, the facts upon which she based her opinion, then First Amendment rights in the context of civil litigation lie eviscerated.

In my opinion, this Court's decision in *Kanaga I* will have a chilling effect on the exercise of fundamental rights of free speech and free press that are vital to our democracy. This is why I am in the uncomfortable and awkward position of having to part company with my colleagues. That awkwardness is compounded by the fact that the present appeal compels, in my opinion, reconsideration of the Court's decision in this case, a decision which issued almost four years ago. The law of the case doctrine, however, is not a bar to such reconsideration, as I explain in detail later, when the earlier decision is either unwise precedent or results in a manifest injustice. Ultimately, I am convinced that this Court should vacate *Kanaga I*, and affirm the original decision by the Superior Court.

## I. INTRODUCTION

Libel cases involve an inherent conflict between vindication of personal and professional reputations, on the one hand, and the First Amendment rights that are essential to our democracy, on the other. I believe the *Kanaga I* opinion to be in error in a way that leaves unprotected fundamental rights to speech and to a free press. The majority in this appeal after remand is poised to send the matter back for yet another trial, this time on the question of damages. In my opinion, however, not even the first trial should have taken place.

A libel action cannot lie against a speaker for expressing an opinion that does not imply false, defamatory facts.[15] Because of the current posture of this case, I must dissent.

## II. THE MERITS

As the majority correctly observed in *Kanaga I*, the United States Supreme Court has made it clear that, although pure expressions of opinion are protected speech, publication of opinion that implies an undisclosed, defamatory fact may support an action for libel.[16] Chief Justice

13. *Kanaga v. Gannett Co., Inc.*, Del.Supr., 687 A.2d 173 (1996)(*"Kanaga I"*).

14. The jury returned a verdict of $422,000 against Kane, $2,850,000 against Gannett and $10,000 against the reporter who wrote the article. This included compensatory and punitive damages. The amount of damages is the issue currently on appeal.

15. *Milkovich v. Lorain Journal Company*, 497 U.S. 1, 23–36, 110 S.Ct. 2695, 111 L.Ed.2d 1 (1990) (Brennan, J., dissenting); *Partington v. Bugliosi*, 56 F.3d 1147, 1156 (9th Cir. 1995)("we join with the other courts of appeals in concluding that when an author outlines the facts available to him, thus making it clear that the challenged statements represent his own interpretation of those facts and leaving the reader free to draw his own conclusions, those statements are generally protected by the First Amendment"); *Phantom Touring, Inc. v. Affiliated Publications*, 953 F.2d 724 (1st Cir.), *cert. denied*, 504 U.S. 974, 112 S.Ct. 2942, 119 L.Ed.2d 567 (1992); *White v. Fraternal Order of Police*, 909 F.2d 512, 522 (D.C.Cir.1990); *Foretich v. Glamour*, 753 F.Supp. 955 (D.D.C.1990); *Roffman v.. Trump*, 754 F.Supp. 411 (E.D.Pa.1990); *People for the Ethical Treatment of Animals v. Berosini*, 111 Nev. 615, 895 P.2d 1269 (1995); *Immuno, A.G. v. Moor-Jankowski*, 77 N.Y.2d 235, 566 N.Y.S.2d 906, 567 N.E.2d 1270, *cert. denied*, 500 U.S. 954, 111 S.Ct. 2261, 114 L.Ed.2d 713 (1991); *Rappaport v. VV Publishing Corp.*, 223 A.D.2d 515, 637 N.Y.S.2d 109 (1996); *Diez v. Pearson*, 834 S.W.2d 250 (Mo.Ct.App.1992).

16. A libel action involves four elements—defamation, falsity, fault, and damages. In order to find a defendant responsible for libel, a jury must find that the speaker published a

Rehnquist, writing for the majority in *Milkovich,* recognized that when a speaker says "in my opinion 'John Jones' is a liar," the speaker implies a knowledge of facts that support a conclusion that Jones told an untruth.

> Simply couching such statements in terms of opinion does not dispel these implications; and the statement "in my opinion John Jones is a liar" can cause as much damage to reputation as the statement, "Jones is a liar" ... [I]t would be destructive of the law of libel if a writer can escape liability for accusations of [defamatory conduct] simply by using, explicitly or implicitly, the words "I think." [17]

This case, therefore, raises one decisive question: do Kane's expressions of opinion (alleged to be libelous) imply to the reasonable reader undisclosed, untrue and defamatory facts? As the *Kanaga I* Court correctly noted, a determination of this question turns on the *context,* as well as the language, of the opinions stated.[18] If the opinion at issue does *not* imply any undisclosed facts, a court should dismiss the libel action before the plaintiff presents her case to a jury. The First Amendment protects a speaker's pure opinion—statements "[n]o reasonable reader can understand to be impliedly asserting ... fact." [19] If, on the other hand, an opinion does imply that undisclosed facts serve as the basis for the opinion, a court should allow a jury to hear the case to determine whether those undisclosed facts are defamatory and false. Logic dictates that if an opinion is accompanied by the true and undisputed facts which serve as the basis for that opinion, then a reasonable reader (and therefore a court) would be unlikely to believe that the opinion implies some other undisclosed factual foundation beyond that already disclosed. In such a circumstance, moreover, a reasonable reader can interpret the disclosed, underlying facts for himself and determine whether he believes the opinion is justified.

statement that injured the plaintiff's reputation, that the statement was false, that the statement was published with a requisite degree of fault, and that a financial injury to the plaintiff resulted. Inseparable from libel analysis, however, is a necessary constitutional inquiry, which I discuss in the text of this dissent.

17. *Milkovich,* 497 U.S. at 18–19, 110 S.Ct. 2695 (citation omitted).

18. The "context" of a statement, however, is more subtle than the *Kanaga I* opinion indicates. A proper analysis of "context" involves three elements. First, a court should consider the *factual* context, the background of events leading to the speaker's statement. *See, e. g., Information Control Corp. v. Genesis One Computer Corp.,* 611 F.2d 781 (9th Cir. 1980) (analysis of party's motivation for bringing suit would be unlikely to be interpreted as statement of fact in political and labor contexts). Second, a court should consider the *linguistic* context, verbal cues often prefacing the challenged statements indicating that the speaker is voicing her opinion. *See, e.g., Stuart v. Gambling Times, Inc.,* 534 F.Supp. 170 (D.N.J.1982) ("I consider" signals opinion); *Pease v. Telegraph Publishing Co.,* 121 N.H. 62, 426 A.2d 463 (1981) ("I do feel" signals opinion). Third, a court should consider the *formal* context, whether the challenged statements appear in, for example, a column, an editorial, a review, or (as here) as part of a "news package". *See* Bruce W. Sanford, Libel and Privacy, Aspen Law & Business (2000, 2d ed.) pp. 200.5–200.23. If a court concludes, after considering all three contexts, that the average reader would realize that the statements constitute solely the speaker's opinion, then the court must find that the First Amendment protects those statements. I conclude that the *explicit* context of the allegedly libelous opinions here (which include recitation in the same newspaper article of the facts upon which those opinions were based) clearly indicates that the opinions are protected speech. Therefore, I need not address the three types of context mentioned above, which are helpful analytical tools in many First Amendment cases. *See generally,* Bruce W. Sanford, Libel & Privacy, *supra,* pp. 194–200.23.

19. *Milkovich,* 497 U.S. at 28–36, 110 S.Ct. 2695 (1990) (Brennan, J., dissenting) ("[A]s long as it is clear to the reader that he is being offered conjecture and not solid information, the danger to reputation is one which we have chosen to tolerate in pursuit of individual liberty ....").

The *Kanaga I* Court quoted its earlier decision in *Riley v. Moyed:*

> To support a cause of action for libel, the underlying facts must be false as well as defamatory. When an opinion is accompanied by its underlying *nondefamatory* factual basis, a defamation action premised upon that opinion would fail no matter how unjustified, unreasonable or derogatory the opinion might be .... This is so because readers can interpret the factual statements and decide for themselves whether the writer's opinion was justified.[20]

The *Kanaga I* Court also quoted with approval Justice Brennan's dissent in *Milkovich* in which Justice Brennan indicates that the published account at issue there could not be libelous because the reporter revealed the facts upon which he was relying and made it clear at which point "he [ran] out of facts and [was] simply guessing."[21] Accordingly, when an opinion is accompanied by its underlying, nondefamatory factual predicate, that opinion cannot serve as the basis for a libel action.

The following *true* and *undisputed facts* were disclosed in *The News Journal* article:

1. Kane was a patient of Dr. Kanaga;
2. Kane had a benign tumor;
3. Dr. Kanaga recommended a hysterectomy to remove the tumor;
4. A second doctor, Dr. Domingo, removed the tumor by grasping it with forceps and twisting it out, without performing a hysterectomy or removing any reproductive organs;
5. The forceps procedure is less invasive and expensive than the hysterectomy which Dr. Kanaga recommended;[22] and
6. Dr. Kanaga's office requested that Kane pay $500 before the hysterectomy procedure.

It is essential to a proper understanding of the issues in this case to be aware that these factual disclosures in The News Journal article are absolutely true and, themselves, cannot form the basis of a libel action.

Dr. Kanaga claims that three separate statements of Kane's opinion that appeared in *The News Journal* article libeled her:

1. Kane's "belief" that Dr. Kanaga "committed a serious breach of the standard of care a patient has a right to expect and the duty of care required of a physician;"
2. Kane's "conclusion" that Dr. Kanaga "chose the treatment plan that was most profitable for her with no concern for [Kane];" and that
3. Dr. Domingo appeared "incredulous" when Kane asked him if she needed a hysterectomy.

These opinions, reported in *The News Journal,* clearly are not libelous because it is obvious that the factual predicate for those opinions is the set of true facts that also are set forth in the article. Because I conclude, in the context of *The News Journal* article, that these three statements represent expressions of opinion protected by the First Amendment, I would affirm the initial decision of the Superior Court

20. *Kanaga I,* 687 A.2d at 178 (quoting *Riley v. Moyed,* Del.Supr., 529 A.2d 248 (1987)).

21. *Kanaga I,* 687 A.2d at 179–80 (quoting *Milkovich,* 497 U.S. at 28–36, 110 S.Ct. 2695 (Brennan, J., dissenting)).

22. The forceps procedure (known as a "myomectomy") is not an experimental or novel gynecological procedure. To me, that fact further supports the reasonableness of Kane's suspicions about Dr. Kanaga's recommendation of the far more intrusive, and expensive, hysterectomy procedure. *See* Dr. Gary S. Berger, M.D., *Outpatient Uterine Myomectomy* (visited March 30, 2000) *http://www.inciid.org/myomectomy.html* (Twenty-five percent of all operations for fibroid tumors are myomectomies. Myomectomies preserve a woman's fertility and can be performed as outpatient surgery at half the cost as in-hospital surgery.); *see also,* Dr. Stanley T. West M.D., *The Hysterectomy Hoax* (visited March 30, 2000) <*http://www.repmed.com/* >.

trial judge granting summary judgment in favor of defendants.

To use the example cited by the United States Supreme Court in *Milkovich* and adopted by this Court in *Kanaga I*, the statement "I think Jones is a liar" *may* imply undisclosed defamatory facts and, thus, support a libel action despite the statement taking the form of an opinion. Suppose the entire statement, however, is that "Jones promised to paint my house yesterday. He never showed up. I think he is a liar," and assume that the disclosed predicate facts are true. The statement of opinion ("he is a liar") is clearly based on the facts disclosed, and the statement is not libelous. That is because no one hearing the statement would infer some undisclosed, untrue and defamatory fact: *the facts disclosed are sufficient to support the opinion stated.* Since the speaker has disclosed the true factual basis for his opinion, that opinion is protected speech even if it turns out that (unbeknownst to the speaker) Jones was run over by a streetcar on his way to keep his house-painting appointment.[23]

In this case, Dr. Kanaga told Kane, as reported in *The News Journal,* that she needed a hysterectomy, an invasive surgical procedure, to treat a benign tumor. Dr. Kanaga asked Kane to pay a substantial sum of money before this procedure was performed. Before her scheduled procedure with Dr. Kanaga, Kane went to a hospital emergency room where another doctor removed the tumor simply by grasping it with forceps and twisting it out. These are the disclosed, true facts. Kane's allegedly libelous statements of opinion are that she received improper treatment from Dr. Kanaga, that Dr. Kanaga cared about maximizing income rather than the health of her patient, and that the second doctor appeared "incredulous" when Kane asked him if she needed a hysterectomy. No reader, understanding the true facts stated in this article, would conclude that Kane's opinions were based on anything other than the disclosed, true facts.[24] No reader would infer that Dr.

23. *See Riley,* 529 A.2d at 254 ("when an opinion is accompanied by its underlying nondefamatory factual basis, a defamation action premised upon that opinion will fail no matter how unjustified, unreasonable or derogatory the opinion might be").

24. The only disputed statement that arguably implies an undisclosed defamatory fact is the statement in the article that Dr. Domingo appeared to have reacted with incredulity after Kane asked him whether she needed a hysterectomy. The article does not represent that Dr. Domingo *stated* that he was incredulous, however, or that he was *in fact* incredulous. What it did report was apparently Kane's opinion that, in his response, he spoke "incredulously," that is, he *sounded* incredulous. The article implies that Kane inferred from his tone of voice that Dr. Domingo was surprised at Dr. Kanaga's recommendation. The explicit context of this statement of opinion is that Dr. Domingo removed Kane's tumor with a simple forceps procedure rather than the hysterectomy recommended by Dr. Kanaga. Kane's opinion that Dr. Domingo sounded surprised at Dr. Kanaga's recommendation implies no fact beyond the true facts explicitly stated in the article and, thus, that statement of opinion cannot support liability. Put another way, it is a true fact that Dr. Domingo's course of treatment differed radically from that proposed by Dr. Kanaga, and no reader would infer another, unstated reason for the surprise which Kane believes she heard in Dr. Domingo's voice.

As I have stated repeatedly, my dissent is based upon what I perceive to be the constitutional damage done by the *Kanaga I* opinion. With respect to the statement that Dr. Domingo spoke "incredulously," however, it is worth noting that whether Kane perceived a tone of what appeared to be incredulity in Dr. Domingo's voice is not readily subject to proof, and thus cannot support a libel action. *Compare Milkovich,* 497 U.S. at 21–22, 110 S.Ct. 2695 *with Gaunt v. Pittaway,* N.C.App., 520 S.E.2d 603, 608 (1999). The trial court correctly described the perceived "incredulity" as nothing more than Kane's "spin" on events. Trial Court Op. at 7.

For a recent example where a court found statements not objectively provable as true or false to be protected opinion, *see Cochran v. NYP Holdings, Inc.,* 58 F.Supp.2d 1113 (C.D.Cal.1998), *aff'd.,* 210 F.3d 1036 (9th Cir., 2000) (holding statements that lawyer's trial strategy was to "get off" a clearly guilty defendant, even at the expense of the truth, was protected speech because the comments were not susceptible of being proven true or false).

Kanaga had committed some *separate*, undisclosed breach that engendered Kane's opinions; the opinions directly and obviously flow from the stated, true facts.

While the *Kanaga I* Court indicated that Kane's opinions may imply some unstated defamatory fact, its failure to identify any implied defamatory fact exposes the weakness of its analysis. In attempting to set forth what it believed to be the implied false assertions of fact in *The News Journal* article, the *Kanaga I* Court pointed to the following: (1) Dr. Kanaga knew or believed the recommended hysterectomy was not necessary; (2) that this conclusion is supported by the fact that Dr. Domingo was able to remove the tumor easily under emergency room conditions; (3) Dr. Domingo was "incredulous" at the suggestion that a hysterectomy had been recommended by Dr. Kanaga; and (4) Dr. Kanaga's motive was personal gain.[25] None of these points, however, are implied, undisclosed, false facts. Points 1, 3 and 4 are the disputed *opinions themselves*, not the underlying facts that they imply. Point 2 is, in actuality, a true *disclosed fact*, not an implied false fact. The *Kanaga I* Court confusingly conflated the actual opinions and the implied facts. No rational reader of *The News Journal* article would infer some undisclosed factual basis for Kane's opinions because they are amply and explicitly supported by the facts disclosed.

Moreover, this Court seems to have overlooked in part the factual support for Kane's opinion explicitly published by *The News Journal*. A key fact supporting Kane's statement that profit rather than care motivated Dr. Kanaga is the doctor's demand for a $500 up-front payment for the hysterectomy procedure, a payment representing the portion of the fee which Kane's medical insurance did not cover. That fact demonstrates to a reader how Kane reached her conclusion that profit motivated Kanaga. A full, thorough analysis of the factual basis of Kane's opinion must consider this fact. Unfortunately, the *Kanaga I* Court apparently overlooked this fact:

> Because she had been treated successfully by Dr. Domingo, Ms. Kane felt that Dr. Kanaga had recommended an unnecessary and radical form of treatment to earn a larger fee than the myomectomy [the forceps procedure] would have earned her. *There is no evidence on this summary judgment record that Ms. Kane had or stated a factual basis for her opinion.*[26]

This failure to consider all relevant facts, including the demand for a $500 payment before the surgery, illuminates how the *Kanaga I* Court reached what I believe to be an erroneous decision.

In *Rinsley v. Brandt*, the United States Court of Appeals for the Tenth Circuit examined allegedly defamatory statements about a doctor whose patient, while undergoing psychiatric treatment, choked to death during a tube feeding. The author opined that "God, parenthood and love were out; they all had been replaced by psychiatric theory. A theory to which they were willing to sacrifice a child's life . . . what does it take to stop such a man? How many more children must die?" The author claimed that the doctor in question was "accountable, in effect, to no one" and wrote that he would characterize this particular doctor's methods by this "chilling example." [27]

The *Rinsley* Court found that the First Amendment protected the author's statement as opinion. The Court pointed to several reasons for its decision. Two of these reasons apply to this case. First, the *Rinsley* Court recognized that the author had disclosed the justification for his opinions and, therefore, readers could understand how the author had reached his conclusions. Similarly, in this case, the

25. *Kanaga I*, 687 A.2d at 181.

26. *See Kanaga I* at 175 (emphasis added).

27. *Rinsley v. Brandt*, 700 F.2d 1304 (10th Cir.1983).

facts upon which Kane formulated her opinions also have been disclosed. Second, the Court in *Rinsley* concludes that the statements are "severe criticisms of [the doctor] and his methods. But they are exactly that—exaggerated expressions of criticism. They are the types of statement that our society, interested in free and heated debate about matters of social concern, has chosen to protect."[28] The *Rinsley* Court found that the First Amendment protected the author's criticism of the doctor's treatment of a patient.[29] The same is true here.

In *Gaunt v. Pittaway,* the North Carolina Court of Appeals considered statements in a newspaper article questioning a doctor's lack of training and expertise in the field of *in vitro* fertilization, and opining that the doctor had recommended unnecessary and excessive tests. The *Gaunt* Court held that this criticism was not actionable because "[t]he United States Supreme Court has held that statements of opinion relating to matters of public concern which do not contain provable false connotations are constitutionally protected."[30]

Similar to *Gaunt* and *Rinsley,* and under the same rationale this Court stated clearly in its *Riley v. Moyed*[31] decision, the expressions of opinion at issue here, even if erroneous, do not imply undisclosed, untrue and defamatory facts and are thus protected under the First Amendment to the United States Constitution.[32] Kane received what she believed to be improper medical treatment from Dr. Kanaga. She stated the true factual basis on which she based this opinion, and then forcefully stated the opinion. If an individual cannot state her opinion in the context of its factual basis, without being subject to liability, it is difficult to understand what remains of the right to free speech in the context of a private libel action. It is precisely in this type of situation—where a patient has received treatment or advice from a physician that she believes to have been improper or substandard—that the right to voice that opinion is paramount not only to the speaker, but to society in general. The fact that Dr. Kanaga was ultimately cleared of wrongdoing by the Medical Society has no bearing on the protected nature of Kane's opinion.

In this case, Kane criticized her doctor and a newspaper published a story about it. The Medical Society later cleared the doctor and the newspaper published a follow-up story. Regardless of the ultimate decision of the Medical Society, the public has a legitimate interest in knowing that a patient has accused her doctor of unethical behavior. In allowing Dr. Kanaga to proceed to a jury to vindicate purported damage to her reputation, the Delaware Supreme Court has put into place a decisional framework that will necessarily have a chilling effect on the ability of the press to publish information of vital importance to the public. A consequence of the *Kanaga I* decision will be mischief that I am sure this Court did not intend.[33]

28. 700 F.2d at 1309.

29. *Id.*

30. *Gaunt v. Pittaway,* N.C.App., 520 S.E.2d 603, 608 (1999).

31. 529 A.2d 248 (1987).

32. Perhaps I should pause here to note that the *Kanaga I* opinion included cryptic references to Art. I, § 5 and § 9 of the Delaware Constitution of 1897. To me, these references miss the mark because state constitutions may provide more generous rights than the United States Constitution, but a state constitution may not (as the *Kanaga I* opinion implied) operate to afford citizens (or the media) *less* freedom than the United States Constitution.

33. To make matters worse, *Kanaga I* provides cold comfort to busy trial judges interested in direction on difficult libel cases involving potentially defamatory statements of opinion. It gives no helpful direction on the appropriate procedure to follow in such cases. We should provide clear guidance for trial judges in cases where expressions of opinion are involved. As a general approach to the problem I would propose the following: If a judge determines that the statement claimed to be libelous is an expression of opinion, the judge first must inquire whether the statement

## III. LAW OF THE CASE

In a careful and thoughtful opinion in this case in 1995,[34] the Superior Court trial judge granted summary judgment in favor of defendants concluding that the statements in question were constitutionally protected opinions. That decision was appealed to this Court, considered by a panel of which I was not a member, and reversed in 1996 (*Kanaga I*). It is that 1996 decision by a panel of this Court that I find erroneous, and from which I dissent. Following the remand to the Superior Court, the case was tried before a jury, which awarded money damages to the plaintiff. Currently on appeal are other issues not directly related to this Court's liability opinion in its *Kanaga I* decision.[35] Given the current posture of this case, then, it is legitimate to ask whether the law of the case doctrine forms a bar to *Kanaga I*'s reconsideration. Although I am loathe to disagree in this forum with my colleagues, it is my belief that *Kanaga I* is not only in error and unjust to the litigants, but it will also have a chilling effect on the exercise of fundamental constitutional rights by others. The law of the case doctrine must give way before the weight of these considerations.

Under the law of the case doctrine, issues resolved by this Court on appeal bind the trial court on remand, and tend to bind this Court should the case return on appeal after remand. Is law of the case a bar to our reconsideration of *Kanaga I*?

The law of the case doctrine certainly binds inferior courts to act in accordance with an appellate court mandate.[36] This Court imposes this rule to promote the obedience of inferior courts as well as the objectives of efficiency and finality.[37] In the context of a post-remand appeal to the appellate court, of course, the obedience rationale of the doctrine does not apply. Still, earlier decisions in the same case generally bind this Court. The effect of abandoning the doctrine in that context would not be inconsequential, because considerable inefficiencies would result if parties were free to relitigate after remand issues decided in an earlier ruling of this Court.

The doctrine is not applied inflexibly, however, as higher values than efficiency do exist. This Court has recently emphasized that it need not apply the doctrine to promote efficiency at the expense of this Court's greater interest in preventing unjust results or unwise precedent. In *Brittingham v. State,* this Court noted that although

> [t]he 'law of the case' doctrine ... bars relitigation [of the issue in question] where that issue has been previously decided by this Court .... [the doctrine] is flexible (unlike res judicata ...). It will not be enforced where doing so would produce an injustice. But it does apply ... unless some reason is shown for not applying it .... [38]

nonetheless *implies* a fact that itself may be false and defamatory. If the answer to this inquiry is negative, as a matter of law under the appropriate Superior Court Rule 12(b)(6) or 56 standard, the judge should dismiss or enter judgment in favor of the defendant. If the judge determines that the opinion may imply false and defamatory facts, the judge should identify such implied facts before submitting the issue to the jury and should require the jury to make a specific finding of truth or falsity as to each of the implied facts. Any damages must be tailored to redress the injury, if any, caused only by particular implied facts found by the jury to be false.

**34.** Kanaga v. Gannett Co., Inc., Del.Super., 1995 WL 716938, Herlihy, J. (Oct. 20, 1995).

**35.** On the other hand, had the *Kanaga I* Court not made the mistake of reversing the grant of summary judgment in the first place, the issues with which the majority grapples here (in an opinion with which I concur) would never have been reached.

**36.** *See, e.g., Insurance Corp. of America v. Barker,* Del.Supr., 628 A.2d 38, 40 (1993).

**37.** *Barker,* at 41, citing *Litman v. Massachusetts Mutual Life Insurance Co.,* 825 F.2d 1506, 1511 (11th Cir.1987).

**38.** *Brittingham v. State,* Del.Supr., 705 A.2d 577, 579 (1998) (quoting *United States v. Mazak,* 789 F.2d 580, 581 (7th Cir., 1986)).

The doctrine thus applies a constraint, but not an absolute bar, to reconsideration of issues by this Court. A court "enunciating a rule of law to be applied in a particular case establishes the law of the case," which "other courts owing obedience to it *must*, and which itself *will*, *normally* apply to the same issues in subsequent proceedings in that case." [39]

In addressing the law of the case doctrine, this Court has cited with approval the reasoning of the United States Court of Appeals for the Eleventh Circuit in *Westbrook v. Zant.*[40] In *Westbrook*, the Eleventh Circuit noted that appellate courts impose the law of the case doctrine upon themselves in the interest of judicial efficiency, and that those courts maintain the power to disregard the doctrine. The *Westbrook* Court held that the doctrine is "not an inextricable command ...," emphasizing that "justice is better than consistency." [41] Among the circumstances in which the law of the case doctrine should not apply, the *Westbrook* Court noted the situation where "the previous decision was clearly erroneous and would work a manifest injustice." [42]

The majority opinion correctly notes that law of the case analysis, like application of *stare decisis*, always involves a tension between our desire to develop a consistent jurisprudence and our duty to decide each case correctly to the best of our ability and understanding of the facts and the law. The majority points out that the *Kanaga I* Court had a "different composition": I was not a member. No one understands better than I that this makes the necessity of dissent here doubly awkward. It gives me no pleasure to pen this dissent, and the doctrine of law of the case is a device that I would gladly employ to avoid it, were I not convinced that injustice would be the result.

The majority, while right to value consistency as a virtue, overstates its importance. If, as they claim, a result here inconsistent with *Kanaga I* will shake public confidence in the courts, how much more will a consistent but unjust and unwise result shake public confidence in the courts? To its credit, this Court has not always found consistency a bar to self-correction in the interest of justice.[43]

Ultimately, we have two options before us. Let *Kanaga I* stand on law of the case grounds, with the potential for future multi-million dollar verdicts and the resulting chilling effect on the exercise of constitutional rights, or exercise our plenary power not to apply the doctrine in the interests of justice. With due respect for the promotion of judicial efficiency, we are not bound by the decision in *Kanaga I* if, as I believe clearly is the case, that decision was erroneous, unjust and unwise precedent. The law of the case doctrine does not bar this dissent. And it certainly does not bar this Court, which is after all a court of last resort.[44]

39. *Westbrook v. Zant*, 743 F.2d 764, 768 (11th Cir.1984)(emphasis added), (quoting *inter alia* 1 Moore, Federal Practice § 0.404(1)).

40. *Barker*, 628 A.2d at 40 (citing *Westbrook*, 743 F.2d at 768).

41. 743 F.2d at 768.

42. 743 F.2d at 769.

43. *See, e.g., Brehm v. Eisner*, Del.Supr., 746 A.2d 244 (2000); *Public Water Supply Co. v. DiPasquale*, Del.Supr., 735 A.2d 378 (1999); *Weinberger v. UOP, Inc.*, Del.Supr., 457 A.2d 701 (1983).

44. Trial courts also recognize their power and duty to correct their own error. *See, e.g.*, Ct. Ch. Rule 60 (allowing Court to correct *sua sponte* earlier judgment). For an excellent recent example where a Court of Chancery trial judge honestly and straightforwardly corrected an earlier legal error in the same case, *see Scureman v. Judge*, Del.Ch., 747 A.2d 62 (1999) (holding the Court had incorrectly assumed that a public right of way moves with the shoreline of a public waterway; Court granted relief from its earlier judgment, *even though the earlier erroneous judgment had been affirmed by the Delaware Supreme Court*).

## IV. CONCLUSION

Because *The News Journal* article published only true assertions of fact together with Kane's opinion, and because that opinion, in the context of those published true facts, does not imply any undisclosed defamatory facts, the Superior Court trial judge's original judgment for defendants was clearly correct. As Justice Felix Frankfurter once wrote, "wisdom too often never comes, and so one ought not to reject it merely because it comes late." [45] It is not too late for this Court to act wisely and to affirm the Superior Court trial judge's thoughtful opinion granting summary judgment to the defendants.

I dissent.

---

**45.** *Henslee v. Union Planters Nat'l. Bank*, 335 U.S. 595, 600, 69 S.Ct. 290, 93 L.Ed. 259 (1949).