# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

RED CAT HOLDINGS, INC., a
Nevada corporation; TEAL
DRONES, INC., a Delaware
corporation,

        Plaintiffs,

        v.

AUTONODYNE LLC, a Delaware
limited liability company; DANIEL
SCHWINN, an individual,

        Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

C.A. No. N24C-04-082-SKR

Submitted: November 8, 2024
Decided: February 6, 2025

*Upon Defendant Daniel Schwinn's Motion for Judgment on the Pleadings*

## GRANTED

## MEMORANDUM OPINION AND ORDER

Robert D. Weber, Esq., SHEPPARD, MULLIN, RICHTER & HAMPTON, LLP, Los Angeles, California, David S. Eagle, Esq., KLEHR HARRISON HARVEY BRANZBURG LLP, Wilmington, Delaware. *Attorneys for Plaintiffs Red Cat Holdings, Inc. and Teal Drones, Inc.*

Kevin M. Coen, Esq., Jacob M. Perrone., Esq. Wilmington, Delaware, MORRIS, NICHOLS, ARSHT & TUNNELL LLP. *Attorneys for Defendant Daniel Schwinn.*

**Rennie, J.**

# I. INTRODUCTION

This dispute stems from Defendant Autonodyne LLC's ("Autonodyne" or "the Company") termination of its software licensing agreement with Plaintiff Teal Drones, Inc. ("Teal Drones"). Teal Drones and its holding company, Red Cat Holdings, Inc. ("Red Cat") (collectively "Plaintiffs") originally brought suit in the Court of Chancery, asserting claims for breach of contract, breach of implied covenant, declaratory judgment, and injunctive relief. Plaintiffs also asserted a tortious interference claim and a declaratory judgment claim against Daniel Schwinn, an equity holder of Autonodyne, for his alleged involvement in the termination. The Court of Chancery dismissed the claims against Autonodyne for failure to state a claim, and later, dismissed the claims against Schwinn for lack of subject matter jurisdiction. The case was subsequently transferred to this Court.

Presently before the Court is Schwinn's motion for judgment on the pleadings related to Plaintiffs' claim against him for tortious interference (Count III). For the reasons discussed below, this claim is dismissed. Accordingly, Defendant's Motion is hereby **GRANTED**.

## II. FACTUAL BACKGROUND[1]

Because Plaintiffs' Complaint alleges the same set of facts as their Verified First Amended Complaint in the Court of Chancery,[2] this opinion recites the facts, mostly verbatim, as stated in the Court of Chancery's letter opinion.[3]

### A. THE PARTIES

Plaintiff, Teal Drones, is a subsidiary of Plaintiff Red Cat.[4] This case arises from a Software Licensing Agreement (the "SLA") that Teal Drones entered with Autonodyne in May 2022.[5] Plaintiffs allege that Defendant Daniel Schwinn is the principal equity holder and *de facto* manager of Defendant Autonodyne.[6] Plaintiffs further allege that Schwinn serves on the board of the Company, participates in its daily operations, and oversees its staff.[7]

---

[1] The following facts are derived from the Complaint and the documents incorporated therein. *See* Compl. (D.I. No. 1). Plaintiffs attached the Court of Chancery docket in the case as an exhibit. Thus, this Court considers the original exhibits attached to the pleadings in the Court of Chancery as if incorporated in the pleadings here. *See* Ex.: Court of Chancery Docket (D.I. No. 2).

[2] Other than the "Jurisdiction and Venue" section, Plaintiff's Complaint here is almost identical to its Verified First Amended Complaint in the Court of Chancery action. *See* Verified 1st Am. Compl., *Red Cat Holdings, Inc. v. Autonodyne LLC, et al.*, C.A. No. 2022-0878-NAC, Transaction ID: 68509341, Dkt. 23.

[3] *Red Cat Holdings, Inc. v. Autonodyne LLC*, 2024 WL 342515, at *1–3 (Del. Ch. Jan. 30, 2024).

[4] Compl. ¶ 1.

[5] Compl. ¶ 22; *see also* Verified 1st Am. Compl. Ex. 1 (Software Agreement), *Red Cat Holdings, Inc. v. Autonodyne LLC, et al.*, C.A. No. 2022-0878-NAC, Transaction ID: 68509341, Dkt. 23 (hereinafter "SLA").

[6] Compl. ¶¶ 9, 12.

[7] Compl. ¶ 9.

3

## B. THE SOFTWARE LICENSING AGREEMENT

The SLA was birthed from a professional collaboration between Teal Drones and Autonodyne that had been ongoing since 2020.[8]  The SLA was crafted to regulate Teal Drones's use of the Company's avionics software.[9]  Through the SLA, Teal Drones received a non-exclusive license to use certain avionics software and a limited exclusive license "to certain functionality in the avionics software[.]"[10]  This enabled the Company to continue servicing other customers, to the extent doing so did not conflict with the functionality that it exclusively licensed to Teal Drones.[11]

Three sections of the SLA are of particular significance here: Sections 15.3, 9, and 14.3 (b)–(c).

Section 15.3 restricts public announcements relating to the SLA.[12]  It provides that "[n]either party shall issue or release any announcement, statement, press release, or other publicity or marketing materials relating to this Agreement . . . in each case, without the prior written consent of the other party, which consent shall not be unreasonably withheld or delayed."[13]

---

[8] Compl. ¶ 18.
[9] Compl. ¶¶ 22–23.
[10] Compl. ¶ 23; *see also* SLA § 2.1 (describing the software license).
[11] *See, e.g.*, SLA § 7.4(a) (contemplating that the Company will release software updates to Teal Drones at the same time as its "other customers").
[12] *See* SLA § 15.3.
[13] *Id.*

Section 9 governs confidentiality.[14]  Section 9.1 defines "Confidential Information" as "all Specifications and unpublished Documentation."[15]  This section further provides that "the terms of this Agreement are and will remain the Confidential Information of both parties."[16]

Section 9.3 restricts the parties' use of Confidential Information.[17]  It states: "As a condition to being provided with any disclosure of or access to Confidential Information, the Receiving Party shall: (a) not access or use Confidential Information other than as necessary to exercise its rights or perform its obligations under and in accordance with this Agreement[.]"[18]

Section 14.3(b) grants the Company an express right to terminate the SLA if Teal Drones breaches Section 9.[19]  It provides that: "[Autonodyne] may terminate this Agreement, effective on written notice to [Teal Drones], if . . . [Teal Drones] breaches any of the terms or conditions of Section 2.3, Section 3, Section 9, or Section 10[.]"[20]

---

[14] *See* SLA § 9.1.
[15] *Id.*
[16] *Id.*
[17] *See* SLA § 9.3.
[18] SLA § 9.3.  Section 9.3(d) is also relevant. It states that the Receiving Party shall "ensure its Representatives' compliance with, and be responsible and liable for any of its Representatives' non-compliance with, the terms of this Section."  *Id.*  The parties do not dispute that Red Cat is Teal Drones's "Affiliate," as that term is defined in the SLA. The SLA also defines "Representatives" as including a parties' Affiliates' "employees, officers, directors, agents, and legal advisors."  *Id.* § 1.
[19] *See* SLA § 14.3(b).
[20] *Id.* § 14.3(b), Preamble (defining "Licensor" as "Autonodyne" and "OEM" as "Teal Drones").

Finally, Section 14.3(c) gives either party the right to terminate the SLA in the event of a counterparty's uncured or uncurable material breach.[21] It provides that:

> [E]ither party may terminate this Agreement, effective on written notice to the other party, if the other party materially breaches this Agreement, and such breach: (i) is incapable of cure; or (ii) being capable of cure, remains uncured 30 days after the nonbreaching party provides the breaching party with written notice of such breach[.][22]

## C. THE EMAIL EXCHANGE

On August 21, 2022, Jeff Thompson from Teal Drones emailed Autonodyne's CEO, Steve Jacobson.[23] Thompson's email to Jacobson stated the following:

> Jake, Not sure if you saw Teal / Reveal Technologies['] press release but the response has been tremendous and it's already generating orders. I wanted to give you the heads up that we're developing a similar release about the Teal and Autonodyne relationship. Let me know if you have any objections, or if you want to send us a quote or have our PR team make a quote[.][24]

Three minutes later, Jacobson responded: "That sounds great. I'm on vacay all week up in the Adirondacks. You guys can make up some quote - I'm sure it will be fine or at least a great start."[25]

---

[21] *See* SLA § 14.3(c).

[22] SLA § 14.3(c).

[23] Compl. ¶ 45; Verified 1st Am. Compl. Ex. 2 (Software Agreement), *Red Cat Holdings, Inc. v. Autonodyne LLC, et al.*, C.A. No. 2022-0878-NAC, Transaction ID: 68509341, Dkt. 23 (hereinafter "Email Exchange"). The SLA designates Jacobson as the person to whom any consents, requests, notices, or other communications must be sent for the communications to have legal effect. *See* SLA § 15.4.

[24] Compl. ¶ 45 (footnote omitted); Email Exchange.

[25] Compl. ¶ 45; Email exchange.

6

## D. THE PRESS RELEASE

Two days after the email exchange—without any further contact to Jacobson or the Company regarding the press release—Red Cat issued a press release detailing Teal Drones's relationship with the Company (the "Press Release").[26] Neither Jacobson nor the Company ever saw a draft of the Press Release before Red Cat published it.[27] In the Complaint, Plaintiffs allege that the "Press Release quoted the exact language of the SLA regarding the exclusive rights that the SLA granted to Teal Drones."[28] The Press Release also stated that:

> Under the terms of the agreement, Autonodyne software will only be made available to Teal, effectively jumping Teal ahead of other drone companies seeking to provide multi-vehicle control or capabilities like unlimited surveillance. Competitors will have to develop their own software or secure licenses from others with inferior test performance.[29]

## E. TERMINATION

On August 26, 2023, three days after Red Cat issued the Press Release, the Company delivered a letter to Teal Drones purporting to terminate the SLA (the "Notice").[30] The Notice explained that, in addition to "grossly mischaracteriz[ing] the terms of the Agreement," Red Cat issued the Press Release without the

---

[26] Compl. ¶ 48; Def.'s Answer to Verified Compl. Ex. A (D.I. No. 5) (hereinafter "Press Release").
[27] *See* Compl. ¶¶ 46–47 ("Thus, Mr. Jacobson . . . indicated that Teal Drones could make up a quote on behalf of Mr. Jacobson, and never requested to see or review a draft of the press release").
[28] Compl. ¶ 48.
[29] Press Release.
[30] *See* Compl. ¶ 50; Verified 1st Am. Compl. Ex. 3, *Red Cat Holdings, Inc. v. Autonodyne LLC, et al.*, C.A. No. 2022-0878-NAC, Transaction ID: 68509341, Dkt. 23 (hereinafter "Termination Notice").

Company's consent and included Confidential Information in the published material.[31] Thus, the Notice concluded, Plaintiffs breached Sections 9 and 15.3 of the SLA, which triggered the corresponding termination rights in Section 14.3(b) and (c), respectively.[32]

Plaintiffs allege that, after delivering the Notice, the Company stopped performing under the SLA.[33] Pertaining to Schwinn's involvement, Plaintiffs allege that he orchestrated the Company's decision to send the Notice and that Schwinn directed the Company's employees to stop performing under the SLA.[34] Finally, Plaintiffs assert that Schwinn's actions were motivated by "business motives that have no grounding in the SLA."[35]

### F. PROCEDURAL BACKGROUND

Plaintiffs first brought suit in the Court of Chancery, asserting five claims: (Count I) breach-of-contract; (Count II) breach of implied covenant of good faith and fair dealing; (Count III) tortious interference with contractual relations and prospective contractual relations; (Count IV) declaratory judgment; and (Count V) injunctive relief.[36] Plaintiffs asserted Counts I, II, IV, and V against the Company,

---

[31] *See* Compl. ¶ 50; Termination Notice.
[32] *See* Termination Notice.
[33] Compl. ¶ 53.
[34] *Id.* ¶ 55.
[35] *Id.* ¶¶ 54, 80.
[36] Verified 1st Am. Compl., *Red Cat Holdings, Inc. v. Autonodyne LLC, et al.*, C.A. No. 2022-0878-NAC, Transaction ID: 68509341, Dkt. 23.

8

and Counts III and IV against Schwinn.[37]  The Court of Chancery dismissed the claims against the Company for failure to state a claim.[38]  Later, the Court of Chancery dismissed the claims against Schwinn for lack of subject matter jurisdiction.[39]

This case was subsequently transferred to this Court, where Plaintiffs assert the same claims against the corresponding Defendants.[40]  Schwinn now moves for a judgment on the pleadings, seeking to dismiss the claim of tortious interference against him.[41]  The parties submitted briefs on the motion.[42]  The Court heard oral argument on October 10, 2024, and the parties submitted letter correspondence providing supplemental authority on November 4, 2024[43] and November 8, 2024.[44]

---

[37] *See id.*

[38] *See Red Cat Holdings, Inc. v. Autonodyne LLC*, 2024 WL 342515, at *1 (Del. Ch. Jan. 30, 2024).

[39] *See Red Cat Holdings, Inc. v. Autonodyne LLC*, 2024 WL 1120365, at *1 (Del. Ch. Mar. 14, 2024).

[40] *See generally* Compl.

[41] Def. Daniel Schwinn's Mot. J. Pleadings (D.I. No. 7).  Curiously, Schwinn does not move to dismiss the declaratory claim against him in this motion.  And Autonodyne has not moved to dismiss the claims against it.  Therefore, the only claim at issue in this motion, and addressed here, is Plaintiffs' tortious interference claim against Schwinn.

[42] Def. Daniel Schwinn's Opening Br. Supp. His Mot. J. Pleadings. (D.I. No. 8) (hereinafter "Def.'s Mot."); Pls.' Answering Br. Opp'n Def. Daniel Schwinn's Mot. J. Pleadings (D.I. No. 9) (hereinafter "Pls.' Opp'n"); Def. Daniel Schwinn's Reply Br. Supp. His Mot. J. Pleadings (D.I. No. 11) ("Def.'s Reply").

[43] Letter to The Honorable Sheldon K. Rennie from Kevin M. Coen Submitting Suppl. Subsequent Authority Supp. Def.'s Mot. J. Pleadings (D.I. No. 15).

[44] Letter to The Honorable Sheldon K. Rennie from David S. Eagle, Esquire Regarding Def. Daniel Schwinn's November 4, 2024 Suppl. Submission Supp. Def.'s Mot. J. Pleadings (D.I. No. 17).

## III. PARTIES' CONTENTIONS

### A. PLAINTIFFS' CONTENTIONS

In Count III of their Complaint, Plaintiffs assert that Schwinn tortiously interfered with both (1) the SLA and (2) Teal Drones's prospective business opportunities with its customers.[45]  Pertaining to Schwinn's interference with the SLA, Plaintiffs allege that he wrongfully instructed the Company to purportedly terminate the SLA without notice.[46]  Pertaining to the alleged interference with prospective business relations, Plaintiffs contend that Teal Drones had received customer orders for drone products integrated with the Company's software, but Teal Drones was unable to fulfill those orders as a result of the termination.[47]

An initial point of disagreement between the parties is whether Autonodyne breached the SLA by improperly terminating it.  This question is relevant to the propriety of the alleged interference.  Although the Court of Chancery found that Autonodyne's termination of the SLA was proper and did not constitute a breach, Plaintiffs contend that this ruling was made in "clear error" and urge this Court to reject it.[48]  Plaintiffs point to Thompson and Jacobson's email exchange on August 21, 2022 as proof that Plaintiffs had obtained Autonodyne's consent pursuant to

---

[45] Compl. ¶¶ 76–81.
[46] *Id.* ¶¶ 79–80; Pls.' Opp'n at 10, 24.
[47] Compl. ¶¶ 2–3.
[48] Pls.' Opp'n at 18.

10

Section 15.3.[49]  Plaintiffs also contend that the Press Release "did not disclose any of the actual terms of the SLA, including any material terms, and did not disclose any Confidential Information as defined by the SLA."[50]

Further, Plaintiffs dispute Schwinn's contention that the tortious interference claim is predicated on a finding that the Company breached the SLA.[51]  Plaintiffs argue that the claim is viable even if Autonodyne did not breach the SLA, because a breach is not required to state a tortious interference claim.[52]

Plaintiffs also dispute Schwinn's contention that the "stranger rule" precludes him from being held liable for tortious interference with the SLA based on his participation in the management of Autonodyne.[53]  Plaintiffs argue that the "stranger rule" is no longer good law in Delaware.[54]

### B. SCHWINN'S CONTENTIONS

Schwinn first contends that a tortious interference claim requires a breach of contract.  Therefore, Schwinn maintains that Plaintiffs' claim of tortious interference—with respect to both the SLA and Teal Drones's prospective business relations—fails because the Court of Chancery has found that Autonodyne properly

---

[49] Compl. ¶¶ 45–46; Pls.' Opp'n at 8–9, 17–18.
[50] Pls.' Opp'n at 18.
[51] *See* Pls.' Opp'n at 13–14.
[52] *Id.* at 13–16.
[53] *Id.* at 18–20.
[54] *Id.*

11

terminated the SLA.[55]  Schwinn urges this Court to adopt the Court of Chancery's ruling pursuant to the law of the case doctrine.[56]

As to Plaintiffs' claim that he tortiously interfered with the SLA, Schwinn argues that the "stranger rule" defeats it because he is not a stranger to the business relationship that gave rise to the SLA.[57]  Schwinn asserts that the "stranger rule" still applies to individual defendants like Schwinn.[58]

With respect to the claim that he tortiously interfered with Teal Drones's prospective business opportunities, Schwinn counters that Plaintiffs fail to allege with specificity the business opportunities that fell through due to the termination of SLA.[59]

## IV. STANDARD OF REVIEW

Under Superior Court Civil Rule ("Rule") 12(c), a party may move for judgment on the pleadings "[a]fter the pleadings are closed but within such time as not to delay the trial."  "The standard for a motion for judgment on the pleadings is almost identical to the standard for a motion to dismiss."[60]  "On such a motion, the Court must accept all the complaint's well-pled facts as true and construe all

---

[55] *See* Def.'s Mot. at 14–16.
[56] *Id.*
[57] Def.'s Mot. at 15–16.
[58] Def.'s Reply at 12–13.
[59] Def.'s Mot. t 17–18; Def.'s Reply at 14–16.
[60] *Ford Motor Co. v. Earthbound LLC*, 2024 WL 3067114, at *7 (Del. Super. June 5, 2024) (internal quotation omitted).

reasonable inferences in favor of the non-moving party."[61] "However, a court will not rely upon conclusory allegations[,] and neither inferences nor conclusions of fact unsupported by allegations of specific facts are accepted as true."[62] "The motion will be granted when no material issues of fact exist, and the moving party is entitled to judgment as a matter of law."[63]

## V. ANALYSIS

### A. THE COURT OF CHANCERY DID NOT COMMIT CLEAR ERROR IN HOLDING THAT AUTONODYNE PROPERLY TERMINATED THE SLA.

As a threshold matter, the Court addresses the parties' dispute as to whether the termination of the SLA was lawful. This question is relevant to the consideration of the tortious interference claim.[64] The Court of Chancery found that Autonodyne lawfully terminated the SLA on two independently sufficient grounds: (1) Plaintiffs disclosed Confidential Information in the Press Release, in breach of Section 9.3 of the SLA, and (2) Plaintiffs issued the Press Release without obtaining consent from

---

[61] *Blanco v. AMVAC Chem. Corp.*, 2012 WL 3194412, at *6 (Del. Super. Aug. 8, 2012).

[62] *D'Antonio v. Wesley Coll., Inc.*, 2023 WL 9021767, at *2 (Del. Super. Dec. 29, 2023) (internal quotation and ellipsis omitted).

[63] *Velocity Exp., Inc. v. Off. Depot, Inc.*, 2009 WL 406807, at *3 (Del. Super. Feb. 4, 2009); *see also Jadczak v. Assurant, Inc.*, 2010 WL 445607, at *1 (Del. Super. Jan. 21, 2010).

[64] The parties dispute whether a breach of contract is required for a claim of tortious interference. The Delaware Supreme Court has held that, in a claim that the defendant tortiously interfered with a contract, a finding that a third party lawfully terminated the contract is not fatal to the claim. *ASDI, Inc. v. Beard Rsch., Inc.*, 11 A.3d 749, 751 (Del. 2010) ("The focus of a claim for tortious interference with contractual relations is upon the defendant's wrongful inducement of a contract termination, not upon whether the termination itself was legally justified."). But the lawful termination is still relevant to the multi-faceted consideration of whether an alleged interference was wrongful. *See infra* Sections B., C.

13

Autonodyne, in breach of Section 15.3 of the SLA.[65]  Either of those breaches by itself would trigger Autonodyne's right to terminate the SLA.[66]

Pursuant to the law of the case doctrine, "[o]nce a matter has been addressed in a procedurally proper way by a court, it is generally held to be the law of that case and will not be disturbed by that court unless a compelling reason to do so appears."[67]  "For purposes of law of the case, the prior rulings of the Court of Chancery are treated as if they were made by a Superior Court judge."[68]  Therefore, this Court will not disrupt the Court's Chancery's finding absent clear error, unjust results, or significantly changed circumstances.[69]

Plaintiffs contest the two grounds upon which the Court of Chancery found the termination proper.  Plaintiffs first argue that the Court of Chancery erred in finding that the Press Release disclosed Confidential Information, contending that the Press Release "merely described the existence of the SLA and the general relationship of Teal Drones and Autonodyne pursuant to the SLA."[70]  This Court disagrees.  Section 9.1 of the SLA plainly provides that "the terms of this Agreement

---

[65] *Red Cat Holdings, Inc.*, 2024 WL 342515, at *4–10 (Del. Ch. Jan. 30, 2024).
[66] *See* SLA §§ 14.3(b)–(c).
[67] *Preston Hollow Cap. LLC v. Nuveen LLC*, 2020 WL 7365808, at *5 (Del. Super. Dec. 15, 2020).
[68] *Id.* at *6.
[69] *See Gannett Co. v. Kanaga*, 750 A.2d 1174, 1182 (Del. 2000) ("Exceptions to the law of the case doctrine  for clearly erroneous  decisions,  unjust  results  or  significantly  changed circumstances are not applicable here.").
[70] Pls.' Opp'n at 18.

are and will remain the Confidential Information of both parties."[71] Section 9.3 then provides that the parties shall "not disclose or permit access to Confidential information" other than as required to exercise a right or perform an obligation under the SLA."[72] And Section 14.3(b) permits Autonodyne to terminate the SLA if Teal Drones "breaches any of the terms or conditions of . . . Section 9. . . ."[73] As Plaintiffs admit, "[t]he Press Release quoted the exact language of the SLA regarding the exclusive rights that the SLA granted to Teal Drones . . . ."[74] This constitutes a disclosure of Confidential Information in breach of Section 9.3, which authorized Autonodyne to terminate the SLA pursuant to Section 14.3(b).

Next, Plaintiffs argue that they had obtained Autonodyne's consent when issuing the Press Release, relying on the email exchange between Teal Drones's CEO Jeff Thompson and Autonodyne's Jacobson.[75] The Court of Chancery also addressed this contention. After analyzing the email exchange sentence-by-sentence, the Court of Chancery concluded that Jacobson only "communicated his consent to Thompson's *continued development* of a press release and qualified permission to make up a quote for him as part of that development process. No more and no less."[76] Specifically, Jacobson's statement "That sounds great" could "only

---

[71] SLA § 9.1; *see also Red Cat Holdings, Inc.*, 2024 WL 342515, at *4 (citing to SLA § 9.1).
[72] SLA § 9.3.
[73] SLA § 14.3(b).
[74] Compl. ¶ 48.
[75] Pls.' Opp'n at 8–9, 17–18.
[76] *Red Cat Holdings, Inc.*, 2024 WL 342515, at *6 (Del. Ch. Jan. 30, 2024) (emphasis added).

be understood as Jacobson's response to the contents of Thompson's email, which did not seek consent for publication."[77] The Court of Chancery reasoned that "Jacobson's reply cannot be contorted into a response to a question Thompson did not ask. That is, whether the Company consented to Plaintiffs' publication of the Press Release."[78]

Jacobson's statement, "I'm sure it will be fine," as the Court of Chancery pointed out, is connected to "[y]ou guys can make up some quote" by a hyphen and is trailed by "or at least a great start."[79] Therefore, the language could "only be reasonably read as permissive of Plaintiffs making up some quote as part of the contemplated press release's development."[80] Thus, the Court of Chancery concluded that "[i]t is not reasonably conceivable that this email provided Plaintiffs with the necessary consent to publish a press release relating to the SLA . . . sight unseen."[81]

The Court of Chancery further held that only under a commercially unreasonable interpretation of the SLA can Jacobson's email be read as consent under Section 15.3.[82] The Court of Chancery focused on the facts that Plaintiffs (1) sent a short email and received a reply from Jacobson stating he was on "vacay all

---

[77] *Id.*
[78] *Id.*
[79] *Id.*
[80] *Id.*
[81] *Id.*
[82] *Red Cat Holdings, Inc. v. Autonodyne LLC*, 2024 WL 342515, at *7 (Del. Ch. Jan. 30, 2024).

week," (2) decided to publish the Press Release without sending a draft to the Company; (3) disclosed in the Press Release the exact terms of the SLA, which constitute Confidential Information, and (4) allegedly "mischaracterize[d] the parties' relationship in a way that benefited Plaintiffs and injured the Company."[83] This series of actions, according to the court, reflect "the sort of effects that are avoided by requiring 'prior written consent' before publication of Confidential Information in a press release."[84] The Court of Chancery decried Plaintiffs' position, stating, "the logical reciprocal of Plaintiffs' reading—that Section 15.3 is satisfied by Jacobson's email—would thus be seen to countermand one of the very purposes Section 15.3 was obviously designed to serve."[85] The court concluded that "[e]ven affording Plaintiffs the plaintiff-friendly inferences to which they are entitled, Plaintiffs' argument fails."[86]

After a careful review of the Court of Chancery's analysis, this Court does not have any basis to find that the Court of Chancery committed "clear error." Thus, the Court adopts, as the law of the case, the Court of Chancery's finding that the SLA was properly terminated.

---

[83] *Red Cat Holdings, Inc.*, 2024 WL 342515, at *7.
[84] *Id*.
[85] *Id.*
[86] *Id.* at *6.

**B. PLAINTIFFS FAIL TO PROPERLY PLEAD TORTIOUS INTERFERENCE WITH THE SLA.**

Plaintiffs have not adequately pleaded the necessary elements to establish their claim that Schwinn tortiously interfered with the SLA. A claim for tortious interference with a contract requires a plaintiff to plead "(1) a contract, (2) about which defendant knew, and (3) an intentional act that is a significant factor in causing the breach of such contract, (4) without justification, (5) which causes injury."[87] In this case, Plaintiffs fail to plead sufficient facts to satisfy element (4)—the absence of justification.

There are two approaches to analyze whether Schwinn's conduct was without justification. First, the Court follows the principle that an agent of a company cannot be held liable for tortiously interfering with the company's contract unless he exceeded the scope of his agency.[88] Second, the Court employs the seven-factor test set forth in Section 767 of the Restatement (Second) of Torts to evaluate whether justification exists.[89] Plaintiffs' claim fails under either approach.

---

[87] *Bhole, Inc. v. Shore Invs., Inc.*, 67 A.3d 444, 453 (Del. 2013) (internal emphasis omitted).
[88] *See Am. Bottling Co. v. Repole*, 2020 WL 7787043, at *6 (Del. Super. Dec. 30, 2020) ("An officer of a Delaware limited liability company cannot be held liable for tortiously interfering with his own company's contract unless he acted beyond the scope of his agency." (internal quotation and bracket omitted)).
[89] *See WaveDivision Holdings, LLC v. Highland Cap. Mgmt., L.P.*, 49 A.3d 1168, 1174 (Del. 2012) (adopting the test).

18

### 1. *Plaintiffs Fail To Allege That Schwinn's Conduct Exceeded The Scope Of His Agency.*

Before applying the scope of agency principle, it would be beneficial to first address the parties' related dispute over the viability of the "stranger rule" in Delaware. Relying on the Court of Chancery's decision in *Bandera Master Fund LP v. Boardwalk Pipeline Partners, LP*,[90] Plaintiffs argue that the "stranger rule is no longer good law in Delaware."[91] Schwinn, however, maintains that the "stranger rule" still applies in circumstances where, as here, an agent of a company is acting in the scope of his company role.[92] In support of his position, Schwinn relies upon the Court of Chancery's decision in *In re CVR Refining, LP Unitholder Litigation*.[93] While neither party cites Delaware Supreme Court precedent for their respective positions, their reliance on Court of Chancery caselaw benefits each side in certain respects.

To be sure, the bright-line rule that a claim for tortious interference requires a defendant to be a stranger to the business relationship giving rise to the contract—the so-called "stranger rule"—was squarely rejected by the *Bandera* court.[94] As the Court of Chancery explained in *Bandera*, the first Delaware decision that adopted the "stranger rule" imported it from jurisdictions that have adopted an "absolute

---

[90] 2019 WL 4927053, at *28 (Del. Ch. Oct. 7, 2019).
[91] Pls.' Opp'n at 19 (internal quotation omitted).
[92] Def.'s Reply at 12–13.
[93] Def.'s Reply 12–13 (citing 2020 WL 506680, at *17 (Del. Ch. Jan. 31, 2020)).
[94] 2019 WL 4927053, at *27–28 (Del.Ch. Oct. 7, 2019).

affiliate privilege."[95]  That privilege is based on the theory that "a parent and its wholly owned subsidiaries constitute a single economic unit such that a parent cannot be liable for interfering with the performance of a wholly owned subsidiary."[96]  "Under this theory, interference by a parent in the performance of contractual obligations of its wholly owned subsidiary, no matter how aggressive, is not actionable."[97]  The Court of Chancery rejected this theory, and instead recognized a "limited affiliate privilege."[98]  This approach strikes a balance between "respecting corporate separateness and preserving a parent entity's ability to protect its economic interest in its subsidiaries."[99]

However, *Bandera* has not eliminated the principle that an agent of a company cannot be held personally liable for tortious interference with a contract of the company unless he exceeds the scope of his agency.[100]  That is because this principle is separate from the "stranger rule."  Unlike the "stranger rule," this principle does not implicate concerns regarding corporate separateness.  Indeed, this rule stems

---

[95] *Id.* at *27 (identifying *Tenneco Auto., Inc. v. El Paso Corp.*, 2007 WL 92621, at *5 (Del. Ch. Jan. 8, 2007), as the original adopter of the stranger rule, and explaining that the *Tenneco* decision relied on a decision in Georgia, *Atlanta Mkt. Ctr. Mgmt., Co. v. McLane*, 503 S.E.2d 278, 283–84 (Ga. 1998), which is "part of a competing group of jurisdictions that have adopted an absolute (rather than limited) affiliate privilege").

[96] *Id.* at *26 (internal quotation omitted).

[97] *Bandera Master Fund LP*, 2019 WL 4927053, at *27 (Del. Ch. Oct. 7, 2019) (quoting *Shearin v. E.F. Hutton Grp., Inc.*, 652 A.2d 578, 590 (Del. Ch. 1994)).

[98] *Id.* at *28.

[99] *Bandera Master Fund LP*, 2019 WL 4927053, at *28 (Del. Ch. Oct. 7, 2019).

[100] *See Am. Bottling Co.*, 2020 WL 7787043, at *6; *In re CVR Ref., LP Unitholder Litig.*, 2020 WL 506680, at *17 (Del. Ch. Jan. 31, 2020) (applying the principle to defendants who were board of directors of an LLC).

20

from a basic tenet of corporate law—that a corporation is liable for the acts and knowledge of its agents—that is essential to the corporate form.[101]  It is also based in the well-settled principle that "a party to a contract cannot be held liable for both breaching the contract and for tortiously interfering with that contract."[102]

Here, Plaintiffs do not allege any acts by Schwinn that exceeded the scope of his agency.  Plaintiffs argue that Schwinn's alleged wrongful conduct includes:

> 1) using personal financial motives to concoct a pretext to terminate the SLA; 2) removing Autonodyne's software from Teal Drones'[s] products and return[ing] such products to Teal Drone; 3) shopping Autonodyne's software to other third parties; and 4) proceeding to end the business relationship with Teal Drones [thereby] causing damage to Teal Drones'[s] prospective customers despite having awareness of Autonodyne's CEO Mr. Jacobson's authorization of the issuance of the Press Release.[103]

None of those acts are beyond Schwinn's role as a *de facto* manager and alleged board member of Autonodyne.[104]  Plaintiffs' Complaint alleges that Schwinn had "personal financial motives" in terminating the SLA, but the Complaint is devoid of any allegations detailing such "personal financial motives."[105]  It was only in their answering brief that Plaintiffs assert that Schwinn's "[u]lterior [m]otive" was "to

---

[101] *See id.*; *Stewart v. Wilmington Tr. SP Servs., Inc.*, 112 A.3d 271, 303 (Del. Ch.), *aff'd*, 126 A.3d 1115 (Del. 2015).

[102] *City of Pittsburgh Comprehensive Mun. Pension Tr. Fund v. Conway*, 2024 WL 1752419, at *23 (Del. Ch. Apr. 24, 2024) (internal bracket omitted).

[103] Pls.' Opp'n at 24–25 (internal quotations omitted).

[104] *See* Compl. ¶¶ 9, 12 (alleging that Schwinn is a *de facto* manager and board member of Autonodyne).

[105] Compl. ¶ 54.

find a deal with better financial terms [for Autonodyne] than the contract that Autonodyne had with Teal Drones."[106]  If true, this alleged "personal financial motive" is derived from Autonodyne's business interest and falls squarely within Schwinn's scope of agency as a manager of Autonodyne.  Each of the other three alleged actions—removing Autonodyne's software from Teal Drones products, marketing Autonodyne's software, and ending Autonodyne's relationship with Teal Drones—are also clearly within Schwinn's managerial role at Autonodyne.

Because Plaintiffs fail to allege that Schwinn's alleged acts of interference exceeded the scope of his agency, they have failed to state a claim of tortious interference with respect to the SLA.[107]

### 2. Plaintiffs' Allegations Regarding Justification Are Also Deficient Under The Restatement Balancing Test.

While the Court need not proceed any further, Plaintiffs' allegations about Schwinn's wrongful conduct also flunk the seven-factor balancing test set forth in the Restatement (Second) of Torts.[108]  The factors are as follows:

(a) the nature of the actor's conduct,

---

[106] Pls.' Opp'n at 10.

[107] *See In re CVR Ref., LP Unitholder Litig.*, 2020 WL 506680, at *17; *see also* RESTATEMENT (Second) of the Law of Torts § 770 ("One who, charged with responsibility for the welfare of a third person, intentionally causes that person not to perform a contract or enter into a prospective contractual relation with another, does not interfere improperly with the other's relation if the actor (a) does not employ wrongful means and (b) acts to protect the welfare of the third person." (formatting altered)); *id.* at cmt. b ("The rule stated [in Section 770] is frequently applicable to those who stand in a fiduciary relation toward another, as in the case of ... corporate officers acting for the benefit of the corporation.").

[108] RESTATEMENT (Second) of Torts § 767 (1979).

(b) the actor's motive,
(c) the interests of the other with which the actor's conduct interferes,
(d) the interests sought to be advanced by the actor,
(e) the social interests in protecting the freedom of action of the actor and the contractual interests of the other,
(f) the proximity or remoteness of the actor's conduct to the interference, and
(g) the relations between the parties.[109]

Factor (a)—the nature of the actor's conduct—is a chief consideration,[110] and it weighs in favor of finding justification. As the Court already addressed, Autonodyne's termination of the SLA was found to be proper, so Schwinn's alleged act of instructing the Company to terminate the SLA, is also lawful. Schwinn's alleged act of "shopping Autonodyne products to other third parties"[111] is a permissible commercial act that is consistent with his role as an agent of Autonodyne. At last, Plaintiffs do not adequately allege that Schwinn's conduct is impermissible or otherwise wrongful, nor do they allege that Schwinn committed any other unlawful conduct.[112]

None of the other factors weigh in favor of Plaintiffs' tortious interference claim, either. As discussed above, Schwinn acted as an agent of the Company to further its interest within the scope of his agency. Therefore, factor (b), the actor's

---

[109] *Id.*
[110] *Id.* at cmt. c.
[111] Compl. ¶ 22.
[112] RESTATEMENT (Second) of Torts § 767 at cmt. c. Common examples of wrongful means include physical violence, fraudulent misrepresentation, and threats of litigation. *See id.*

23

motive,[113] factor (d), the interests sought to be advanced by the actor,[114] and factor (g), the relations between the parties,[115] all weigh in favor of finding justification here. As to factor (c), Plaintiffs do not allege that their contractual interest should receive a greater protection than that of others. Therefore, this factor is neutral. Factor (e), the social interests, weigh strongly in favor of finding justification. The social interests in freedom of contract and competition support Autonodyne's right to freely terminate the SLA pursuant to its bargained-for terms and seek better deals. Finally, because Schwinn's alleged act of ordering the termination of the SLA is a direct cause of its termination, factor (f) weighs against finding justification. It is the only factor that goes in Plaintiffs' favor, but does not move the needle on the determination. Therefore, based on Plaintiffs' allegations, the Court cannot reasonably infer that Schwinn's alleged interference with the SLA was improper.

Hence, Plaintiffs fail to sufficiently plead a claim that Schwinn tortiously interfered with the SLA.

---

[113] *See WaveDivision Holdings, LLC*, 49 A.3d 1168, 1174 (Del. 2012) (discussing factor (b) and holding that "[t]he defense of justification does not require that the defendant's proper motive be its sole or even its predominate motive for interfering with the contract. Only if the defendant's *sole* motive was to interfere with the contract will this factor support a finding of improper interference." (emphasis in original)).

[114] *See* RESTATEMENT (Second) of Torts § 767 cmt. f (1979) (stating that an actor's economic interest in acquiring business "is important and will normally prevail over a similar interest of the other if the actor does not use wrongful means.").

[115] *Cf.* RESTATEMENT (Second) of Torts § 767 cmt. g. (1979) ("[I]f A is C's business advisor, it is proper for him to advise C, in good faith and within the scope of C's request for advice, that it would be to his financial advantage to break his contract with B, while it would be improper if he were a volunteer.").

**C. PLAINTIFFS ALSO FAIL TO SUFFICIENTLY PLEAD A CLAIM FOR TORTIOUS INTERFERENCE WITH PROSPECTIVE BUSINESS RELATIONS.**

Plaintiffs also argue that Schwinn's involvement in terminating the SLA tortiously interfered with Teal Drones's prospective contractual relations with its potential customers. To properly state such a claim, Plaintiffs must plead: (1) the reasonable probability of a business opportunity; (2) Schwinn's wrongful interference with that opportunity, (3) proximate causation, and (4) damages.[116]

Plaintiffs fail to adequately plead element (2). Just like with an existing contract, intentional interference with a prospective business relation is only actionable if it is improper or without justification.[117] Whether the interference is improper again turns on the seven-factor balancing test set forth in Section 767 of the Restatement (Second) of Torts.[118]

Because Plaintiffs' claim of tortious interference with prospective business relations is also predicated on Schwinn's alleged role in terminating the SLA, the analysis in the previous section largely applies here. Only two factors are applied differently in relation to the alleged prospective relations, and they both support a finding of justification. Factor (c)—Plaintiffs' interests—weighs against finding

---

[116] *See Organovo Holdings, Inc. v. Dimitrov*, 162 A.3d 102, 122 (Del. Ch. 2017); *Agilent Techs., Inc. v. Kirkland*, 2009 WL 119865, at *6 (Del. Ch. Jan. 20, 2009).

[117] *See Agilent Techs., Inc.*, 2009 WL 119865, at *8; *Int'l Bus. Mach. Corp. v. Comdisco, Inc.*, 1993 WL 259102, at *21 (Del. Super. June 30, 1993) ("Only wrongful interferences will satisfy the tort, as some interferences are seen as justified or privileged under the aegis of competition.").

[118] *See KT4 Partners LLC v. Palantir Techs. Inc.*, 2021 WL 2823567, at *13 (Del. Super. June 24, 2021).

Schwinn's conduct improper here, because their interest in prospective business opportunities is less definite than their interest in an existing contract.[119]  Factor (f), closeness of defendant's conduct to the interference, also militates in favor of finding justification.  This is because the fact that Teal Drones was precluded from fulfilling orders from its potential customers is an indirect and incidental effect of Autonodyne's termination of the SLA.[120]  All seven factors weigh against a finding of improper interference.  Plaintiffs do not sufficiently allege that Schwinn's interference was improper, and thus, their claim of tortious interference with prospective business relations fails.

## VI. CONCLUSION

For the foregoing reasons, Schwinn's motion for judgment on the pleadings is **GRANTED**, and Count III of the Complaint is **DISMISSED**.  Count IV of the Complaint—seeking declaratory judgment against Autonodyne and Schwinn—was not addressed in this opinion and, thus, remains in this action.

**IT IS SO ORDERED.**

_____
Sheldon K. Rennie, Judge

---

[119] RESTATEMENT (Second) of Torts § 766 cmt. e.

[120] *See* RESTATEMENT (Second) of Torts § 767 cmt. h. ("Recovery for A's interference with B's obtaining performance of a contract by C by preventing B from performing himself and thus becoming entitled to C's performance may also be affected by [factor (g)]. The injury to B is his failure to obtain the benefit of C's performance. That consequence is an indirect one and if it was not a part of A's motivation but a mere incidental result of his conduct and if that conduct was not independently tortious or unlawful, the interference will ordinarily be held not to be improper.").